**UNITED STATES of America, Plaintiff,**

v.

**Peter RIVERA, Jr., a/k/a "Little Pete", Pedro Rivera, Sr., Sonia Rivera, Venus Rivera Rosario, August Laguer, Defendants.**

**No. S 85 CR 1072 (JMW).**

United States District Court, S.D. New York.

April 28, 1986.

Arthur W. Mercado, Asst. U.S. Atty. (Rudolph Giuliani, U.S. Atty.), New York City, for plaintiff.

Leonard F. Joy, Legal Aid Soc., New York City, for Pedro Rivera.

Dwight L. Greene, Hofstra Univ. Law School, Hempstead, N.Y., for August Laguer.

Richard Huffman, Baden, Kramer, Huffman & Brodsky, New York City, for Sonia Rivera.

## AMENDED OPINION AND ORDER

WALKER, District Judge.

### Introduction

On March 25, 1986, the Court granted the mistrial motions of defendants Pedro Rivera, Sonia Rivera and August Laguer. Each has now moved for dismissal of the indictment on the ground that retrial would constitute double jeopardy. As part of their motions, they seek a hearing and recusal of this judge. The Court now denies all motions.

### Facts

Indictment 85 Cr. 1072 named Peter Rivera, Jr., Pedro Rivera, Sonia Rivera, Venus Rivera Rosario, and August Laguer as members of a conpiracy to distribute heroin. The indictment also charged various counts of heroin distribution, unlawful weapons possession, and named Peter Rivera, Jr. in a separate conspiracy to distribute cocaine.

On March 12, 1986, twelve days before the scheduled trial date, the government informed the Court by affidavit of a "Potential conflict of interest which Peter Rivera, Jr.'s lawyer in the instant case may have." The affidavit of Assistant United States Attorney Mercado, the prosecutor, recounted that a government witness, Gilbert Bonilla, would testify against Peter Rivera, Jr. and a number of the "workers" in his Lower East Side "White Horse" heroin distribution ring. The affidavit did not specify which "workers" or state whether Bonilla would implicate any of Peter Rivera, Jr.'s co-defendants. It recounted that, the previous day, Bonilla had admitted to Mr. Mercado that he had perjured himself when he testified for the defense in the state court murder trial of another unrelated drug dealer, Raphael Rivera.

The affidavit recounted Bonilla's claim that Raphael's attorney had suborned the perjury. A check by AUSA Mercado revealed that Raphael's attorney in that state trial had been Kenneth Schreiber, a law partner of Kenneth Salaway, Peter Rivera, Jr.'s retained attorney in this case. The affidavit went on to say that Bonilla was "not certain" of the attorney's name but "believes" it to be Salaway, although Bonilla "may be mistaken" since he thinks the attorney who spoke to him at the state trial is "the same one who took his testimony in the court that day."

The affidavit also added that, according to 3500 material, another government wit-

ness recalled a 1978 incident in the Latin Palace discotheque in which no defendants were present but where this unnamed witness and the "lawyers Salaway and Schreiber were all snorting cocaine together" and still another time when the witness believed that Mr. Schreiber came to court "coked up."

The affidavit specifically raised the issue of a conflict of interest between Peter Rivera, Jr. and his counsel, Mr. Salaway. It also requested a pre-trial conference with Mr. Salaway and Peter Rivera at which "Peter Rivera, Jr. would be advised of the potential conflict and options" since "the above facts indicate that the alleged involvement of Mr. Salaway and his partner might interfere with Mr. Salaway's ability to represent Peter Rivera, Jr."

The Court held the requested conference on the record the following day, March 13, 1986, with Peter Rivera, Jr., Mr. Salaway, and Mr. Mercado present. The government did not request, nor did the Court order, the presence of the codefendants or their counsel. The Court provided a copy of the affidavit to Peter Rivera, Jr. and Mr. Salaway and ordered the record sealed.[1]

The Court then briefly outlined the nature of the conflict. Mr. Salaway responded with an unequivocal denial of the accusations on behalf of himself and Mr. Schreiber and affirmed his ability to continue to represent Mr. Rivera. The prosecutor provided his view of the conflict and recommended appointment of independent counsel before taking any waiver by Peter Rivera, Jr. of his right to conflict-free counsel. Peter Rivera, Jr. stated throughout the proceeding that he wanted Mr. Salaway to represent him at trial. The Court decided to appoint independent counsel to "review this matter and give you (Mr. Rivera) independent advice so that you could make an informed decision based on the advice of independent counsel" and adjourned the

conference to the following day. T(3/13) 11–14.

On March 14, 1986, the Court appointed Elliot Sagor as independent counsel. Mr. Sagor conferred with Mr. Rivera and reported to the Court at length on his extensive discussions with Mr. Rivera concerning possible conflicts and Mr. Rivera's persistent expression of the desire to have Mr. Salaway represent him. In two separate allocutions, Peter Rivera, Jr. reiterated his wish to keep Mr. Salaway as counsel. The Court accepted Mr. Rivera's waiver of the right to conflict-free counsel.

On March 24, 1986, trial began as to defendants Peter Rivera, Jr., Pedro Rivera, Sonia Rivera, and August Laguer.[2] After opening statements, two agent-witnesses testified about the availability of "White Horse" heroin on the Lower East Side and about specific purchases of "White Horse" heroin from persons other than the defendants. On March 25, 1986, the government announced that Bonilla would be the next witness.

At that time, Sonia Rivera's counsel reported that he had received Bonilla's 3500 material the previous night and the material revealed that Bonilla had accused Mr. Salaway of possible subornation of perjury. He added that that day he had been informed that Bonilla had "publicly identified his (Mr. Salaway's) partner who was involved in this." T. 86. At the Court's direction the prosecutor proffered what Bonilla would say with respect to the perjury incident. Mr. Salaway then reported that Peter Rivera, Jr. was now "unhappy" with Mr. Salaway representing him "since I would be called as a witness" with respect to the 1978 "coke snorting" incident. T. 90–91. After confirming with Mr. Salaway that he did not represent the defendant at the state murder trial of Raphael Rivera, and did not know Bonilla, the Court or-

---

1. While the Court did not put on the record at the time its reason for sealing the transcript in order to protect the reputations of Mr. Salaway and Mr. Schreiber in the face of unsupported informant accusations, it did so state later at trial. *See* T. 212.

2. The case against Venus Rivera Rosario, who was eight and one half months pregnant, was severed before the trial without objection by the government.

dered the trial to proceed since "any concerns on the part of [Peter] Rivera at this point are hypothetical." T. 92.

When the prosecutor requested the Court to poll other defense counsel as to whether they intended to call Mr. Salaway or Mr. Schreiber to testify, the following colloquy occurred:

THE COURT: First of all, in the event that this witness is unable to identify Mr. Salaway as having been involved in the so-called incident, that resolves the matter as far as calling Mr. Salaway is concerned, does it not?

MR. HUFFMAN (counsel to Sonia Rivera): Correct.

THE COURT: In the event that he identifies Mr. Schreiber in some incident of alleged illegality, then is it your intention to call Mr. Schreiber?

MR. HUFFMAN: We may well call Mr. Schreiber.

THE COURT: Why does that present a problem or difficulty?

T. 92–93.

Mr. Salaway responded that his client's problem was not Mr. Schreiber testifying, but that Mr. Salaway might be asked to testify by co-counsel as to the Latin Palace incident. Mr. Huffman then stated that he would want Mr. Salaway as a witness to the 1978 Latin Palace incident if a witness testified to the incident.

At the government's request, the Court then asked Peter Rivera, Jr. to state his position as to continued representation by Mr. Salaway:

PETER RIVERA: My position is to dismiss my counsel because I didn't really realize there were two witnesses in the case and I didn't feel that it was going to hurt my lawyer to represent me, cross-examining Mr. Bonilla, but then I also realized that there's another witness saying that he was sniffing cocaine inside the Latin Palace.

Also I was speaking to other people in MCC, letting me know that he can help me out in my case if he was called as a witness and he can hurt me if he was called up to the stand in front of the judge—I mean in front of the jury here. It seems like he is involved—

THE COURT: Mr. Rivera, last week you read an affidavit, did you not, of Mr. Mercado?

And that did set forth all of these facts, is that correct?

PETER RIVERA: Yes, your Honor. But also I was speaking to other individuals inside MCC and they were actually coaching me—advising me how I can also get myself out of a situation that I don't belong in.

T. 95–96.

At the government's request, the Court granted a recess. Mr. Huffman requested a copy of the Mercado affidavit; the Court ordered it unsealed and provided to co-defendants. T. 96.

After the recess, the Court directed the trial to proceed against all defendants since the concerns of Peter Rivera, Jr. "are at this point only potential concerns." T. 100. Defendants other than Peter Rivera, Jr. then moved for a mistrial since "it may well be that the jury may believe the witness on the stand with respect to Mr. Salaway having, for example snorted cocaine" and "the jury may well become prejudiced against other counsel." The motions were denied. T. 101. The Court then granted counsels' request for a transcript of the pretrial proceeding:

THE COURT: ... I will allow a transcript to become unsealed. I would caution counsel, though, that this transcript contains, as you can imagine, allegations against counsel, as does the material that you have received, and, therefore, I'm going to permit it to be unsealed, but I'm going to direct counsel not to reveal it or show it to any person other than is necessary for the purposes of this litigation.

MR. HUFFMAN: Fine.

MR. JOY (counsel to Pedro Rivera): I take it that doesn't exclude our clients?

THE COURT: Of course not.

T. 102.

The government expressed concern over proceeding against Peter Rivera, Jr. in the

face of his expressed wish for new counsel. The Court pointed out that Mr. Rivera had not moved for a mistrial. Mr. Salaway reiterated his client's desire to replace counsel but did not move for a mistrial. The Court then stated:

Well, as Mr. Mercado no doubt knows, that if the government seeks to terminate this case at this point, that is the end of the matter. There will be no retrial. And there is a concept of double jeopardy that is in this situation, and, therefore, right now we are prepared to proceed. I see no motion for mistrial on the part of Rivera, and the other motions are denied.

T. 105–106.

The government then requested that independent counsel consult with Peter Rivera, Jr. again. T. 107. Peter Rivera, Jr., through Mr. Salaway, then moved for a mistrial. The following colloquy occurred with counsel for the other defendants:

THE COURT: Do the other defendants also renew their motions for mistrial?

MR. JOY: Can we just have a moment?

THE COURT: Yes. I mean you just made motions for mistrials before.

MR. JOY: This was when Mr. Salaway was still staying in the case. I just want to confer with Mr. Huffman.

THE COURT: The Court hasn't ruled yet.

MR. HUFFMAN: I know.

(Pause)

MR. HUFFMAN: Judge, if Mr. Salaway stays in the case, that is the other defendants' motion.

MR. GREEN (counsel to August Laguer): We all would renew that motion for mistrial.

THE COURT: I don't understand.

MR. GREEN: Our motion is that if Mr. Salaway stays in the case, we move for a mistrial. That was our motion and we do renew that motion.

T. 107–108.

The Court decided to defer decision until the close of the day and proceed with Bonilla's testimony. T. 109. Before doing so, however, the Court asked defense counsel again at a sidebar conference whether their motion was contingent upon Mr. Salaway's continued presence in the case:

THE COURT: Your motion is contingent upon the denial of this motion, of the motion of Peter Rivera. If the motion for Peter Rivera is granted, then your motions disappear at this point.

MR. GREEN: Yes.

THE COURT: All right. I think we will proceed with this witness and we will deal with the issue at the end of the day then, as I have indicated. T. 111.

Bonilla testified on direct examination as to his street activities in the White Horse heroin operation and implicated both August Laguer and Peter Rivera, Jr. T. 113–172. At the end of his direct examination, he admitted that he committed perjury at the state trial of Raphael Rivera. T. 171–172.

After Bonilla's direct examination was completed and the jury removed, the Court stated that independent counsel had been requested to appear and advise Peter Rivera, Jr. T. 172. Counsel for the co-defendants reported that their position had not changed: According to Mr. Huffman, they were moving for a mistrial "if Mr. Salaway is staying in." T. 173. Mr. Joy also stated that "the first decision has to be whether [Salaway] stays in the case." T. 175.

After a recess, independent counsel Sagor reported to the Court that he had conferred with all defense counsel and Peter Rivera, Jr. and that his client now moved to discharge Mr. Salaway and for a severance and mistrial. T. 177–182. The Court granted both motions and directed that the trial continue as to the other three defendants. T. 182.

The trial was discontinued as to Peter Rivera but continued as to the other defendants with Bonilla's cross-examination. Mr. Green, whose client was the only remaining defendant implicated by Bonilla, conducted the cross-examination. Bonilla testified that at the perjury trial, the law-

yer for the defendant Raphael Rivera told him what to say. When asked if the lawyer's name was Salaway, Bonilla replied: "I don't remember his name—his name was Slalway—I can't pronounce the name." T. 188. He said the trial was three years ago and the name was "difficult to remember." T. 188. He said that the person was sitting on the right side of the defense counsel's table at this trial but then indicated that he looked like "this man right in front of me", referring to Mr. Joy, counsel to Pedro Rivera. T. 189–190. Mr. Joy had taken over Mr. Salaway's chair. When asked if he had said he saw Salaway in the courtroom, the witness replied: "You are confusing me." He then said he could not remember seeing the lawyer from the murder trial in the courtroom earlier that day, but his name was something like Salaway. T. 190.

At the conclusion of Bonilla's cross-examination for that day, Mr. Huffman, for Sonia Rivera, moved for a mistrial:

> MR. HUFFMAN: I would make a motion for mistrial for Sonia Rivera. I would like an opportunity to articulate that more fully tomorrow morning. I just thought about it after the witness testified. But it seems to me that the same reasons that applied initially apply now even more strongly because this witness could clearly or potentially identify Mr. Salaway as being in some way involved in a negative way and I think that that really prejudices Ms. Rivera.

T. 204.

The Court reiterated its earlier direction unsealing the pre-trial conference transcript. T. 205. Mr. Huffman asserted that the proceeding to date "borders on government misconduct." The Court stated:

> If you think that you are going to get very far on an argument of government misconduct, I think, that is quite to the contrary. The government brought the matter to the attention of the Court as quickly as possible
>
> It is true that co-counsel were not involved in the hearing, but at that time, because of all the ramifications of this, there was no indication by the govern-

ment, and the Court did not perceive any at that time as to how co-counsel would be prejudiced.

> The matters seem[ed] to be solely as to [the] representation of Mr. Rivera at the time.
>
> You have raised the issue here, but there certainly is no indication of government misconduct based on the record that this Court perceived and the hearing which this Court presided over.
>
> But I will let you examine the record and make appropriate motions.

T. 205–206.

The following day, Sonia Rivera's mistrial motion was joined by defendants Pedro Rivera and August Laguer. Since the pre-trial conference transcripts were unavailable, the Court summoned a court reporter to read the notes of the proceeding. When Mr. Huffman questioned why the conference was held in secret, the following discussion occurred:

> THE COURT: Well, it is quite obvious: allegations of criminal conduct were being made against members of the bar. This is not the kind of thing the court wishes to have advertised or have it placed in open court or have it disseminated.
>
> MR. HUFFMAN: I couldn't agree with you more with respect to that, but I do think, nevertheless, the defendants, who have a rather intimate and very serious interest in this matter, and their counsel, should have been present and could have been placed under a gag order, as you will, much as we are now.
>
> THE COURT: Well, certainly, the fact that you brought this to the Court's attention has resulted in a rapid response and dissemination of this information to you. So I don't see how you are prejudiced at this point in any event.

T. 212–213.

The Court then heard exhaustive argument from each defendant in support of a mistrial motion. The government took no position. The Court granted the motions.

*Discussion*

The defendants have moved to bar retrial on double jeopardy grounds, contending that because their motion for mistrial was caused by prosecutorial or judicial misconduct retrial is barred. They have requested a hearing on the issue and asked the Court to recuse itself as a witness at the hearing.

(1) *Hearing and Recusal*

█ In this case, the defendants have broadly asserted the need for a hearing at which the Court would be a witness. August Laguer requests recusal "to allow a full and fair development of the record without even the appearance of this Court's inappropriately limiting that development or sitting in judgment of itself." Sonia Rivera asserts that recusal is needed since the Court "may be a witness" to alleged "judicial overreaching." Pedro Rivera urges recusal since this Court "may have been a participant" in a series of events which led to the concealment of facts from the defense in this case." He adds that the possible areas of inquiry include (1) why the record of pretrial proceedings was sealed, (2) why co-counsel were not informed of the pretrial proceedings, and (3) why independent counsel for Pedro Rivera was not appointed from the CJA panel.[3]

There is no doubt that if this Court were to be a witness at a hearing, recusal would be necessary. Section 455 of 28 U.S.C. provides that a judge shall disqualify himself if "[h]e ... [i]s to the judge's knowledge likely to be a material witness in the proceeding."

█ As this section implicitly acknowledges, however, the Court need not consider recusal *before* determining whether a hearing is required. The merely conclusory assertion that a hearing is required does not mandate recusal. In *King v. United States*, 576 F.2d 432 (2d Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154

(1978), the petitioner claimed that Judge MacMahon would be a witness at an evidentiary hearing on King's petition to vacate his sentence. In affirming the denial of recusal, the Second Circuit observed:

But in any event—and assuming that Judge MacMahon would be a witness— this would not disqualify him *prior* to the hearing, specifically from determining whether a hearing should be held. *Panico v. United States*, 412 F.2d 1151, 1155–56 (2d Cir.1969).

*Id.* at 437.

Thus the determination of the need for a hearing and the request for recusal go hand in hand: If a hearing is necessary and the Court is a material witness, recusal follows; if no hearing is required, recusal as a witness is not at issue. The Court now turns to the question of whether a hearing is required.

█ Ordinarily, the granting of a mistrial on a defendant's motion or with his consent does not bar retrial. There is, however, an exception to that rule based on overreaching or improper conduct by the prosecutor or the court which the Supreme Court, after noting some confusion in the precedents, has carefully articlated: "[T]he circumstances under which ... a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Oregon v. Kennedy*, 456 U.S. 667, 679, 102 S.Ct. 2083, 2091, 72 L.Ed.2d 416 (1982).

Cases prior to *Kennedy* seemed to indicate a broader exception barring retrial where the misconduct leading to mistrial was intended to have that result *or* where there was "bad faith conduct by judge or prosecutor" or "harassment". *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). In *Kennedy*,

**3.** Pedro Rivera has apparently abandoned any assertion regarding the appointment of Peter Rivera, Jr.'s counsel; it is not referred to in his brief. The appointment of Peter Rivera's concededly competent independent counsel is irrelevant to Pedro Rivera's motion to bar reprosecution. Thus, the emergency appointment of Mr. Sagor, who although not on the CJA panel was immediately available to assist the Court, is not an issue in this case.

the Court acknowledged that "the precise phrasing of the circumstances which *will* allow a defendant to interpose the defense of jeopardy to a second prosecution where the first had terminated on his own motion for a mistrial have been stated with less than crystal clarity in our cases which deal with this area of the law." 456 U.S. at 674, 102 S.Ct. at 2088–89. Accordingly, the Court expressly limited the exception barring retrial to cases where the misconduct was "intended" to provoke a mistrial motion.

The defendants in this case attempt to blunt the effect of *Kennedy* by arguing (1) it was merely a plurality decision, and (2) it is limited by its facts to allegations of prosecutorial conduct and therefore the intent standard enunciated does not apply to overreaching by the court. These arguments are without merit.

First, the decision filed by the court was not a plurality opinion; it was joined by *five* members of the court—a majority. This fact makes the decision a majority opinion even though one member of that majority, Justice Powell, filed a separate concurrence. In fact, Justice Powell's short concurrence emphasizes the importance of the majority's "intention" standard which he said should be applied by a court in reliance "primarily upon the objective facts and circumstances of the particular case." *Id.* at 680, 102 S.Ct. at 2091.

Second, although the facts of *Kennedy* involved only allegations of prosecutorial misconduct, there is no doubt that the court intended to clarify the test for *both* prosecutors and judges. The court was addressing the issue because earlier cases "seem[ed] to broaden the test from one of *intent* ... to a more generalized standard of 'bad faith conduct' or 'harassment' on the part of judge or prosecutor." *Id.* at 674, 102 S.Ct. at 2088–89. The conduct of both had in the past always been examined under the same standard in the double jeopardy context and the foregoing language makes clear that the court was following that practice in *Kennedy.*

Defendant August Laguer cites the concurring opinion of Justice Stevens in support of his point that retrial may be barred if the *court* engaged in conduct "motivated by bad faith or undertaken to *harass* or *prejudice* a defendant." Memorandum at 2. Laguer has misread *Kennedy.* First, Justice Stevens did not join in the five-member majority's application of a strict "intent" standard. He argued for barring retrial where *either* intent or bad faith behavior provoked mistrial. Second, nowhere in his concurrence does Justice Stevens state or even imply that prosecutors should be held to a different standard than judges. In fact, he states that "[t]he exception also encompasses comparable judicial misconduct. Because we are confronted with prosecutorial error, this opinion will address only that context." *Id.* 456 U.S. at 683 n. 12, 102 S.Ct. at 2093 n. 12.

■ The *Kennedy* standard, requiring specific intent to provoke a mistrial before a double jeopardy bar can be applied where the defendant has moved for a mistrial, obviates the need for a hearing in this case. None of the defendants allege such conduct by the Court or prosecutor here, much less offer facts in support of it.

Viewed in the light most favorable to the defendants, their allegations claim that the Court and prosecutor *concealed* from them facts alleged in the Mercado affidavit "which if discovered would force the defendants into moving for a mistrial." Defendant's Brief in Support of Hearing and Recusal at p. 2. Thus the alleged intent was actually to *prevent,* not provoke, a mistrial at the defendants' request. Accordingly, no hearing is required, nor does it appear that there is even a colorable double jeopardy claim.

■ Even if the requisite intent to provoke had been alleged, it does not follow that a hearing would be required here. Some showing of facts beyond bald allegations is required. Moreover, at least one court has held that the application of the *Kennedy* standard does not require a hearing since "the Supreme Court's decision [in *Kennedy* ] lends considerable support to

the proposition that if the prosecutor's [or judge's] intent can be inferred from objective indicia manifested in the record, an evidentiary hearing is not necessary." *Petrucelli v. Smith,* 544 F.Supp. 627, 634 (W.D.N.Y.1982).

In *Kennedy,* the Supreme Court stated:

[A] standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply. It merely calls for the court to make a finding of fact. Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal justice system.

*Id.* 424 U.S. at 675, 102 S.Ct. at 2089.

In the extensive record of two days of pretrial proceedings and two days of trial there is ample objective evidence from which the intent of the Court and prosecutor could be found. Thus, even if the defendants had claimed judicial or prosecutorial misconduct rising to the *Kennedy* standard, a hearing would not be required.

■ Accordingly, since no hearing is required, recusal by the Court as a witness is not warranted. The defendants assert additionally that the Court's duty to disqualify itself in "any proceeding in which his impartiality might reasonable be questioned" pursuant to 28 U.S.C. § 455(a) requires recusal here since the Court is faced with a motion alleging its own misconduct and hence would in effect be sitting in judgment of itself. This ground for recusal is also meritless. A factual basis is required to support a claim under § 455(a). *Markus v. United States,* 545 F.Supp. 998, 1000 (S.D.N.Y.1982) (Weinfeld, J.).

Here, no factual basis for recusal under 28 U.S.C. § 455(a) is presented. The mere claim that the Court, in deciding the double jeopardy motion, will be passing on its own conduct is insufficient. Virtually every motion pursuant to 28 U.S.C. § 2255 requires a judge to pass upon his own judicial conduct. The bare allegation that the "judge is the center of litigation" does not itself warrant a recusal. *Id.* at 1001. *See also King v. United States,* 576 F.2d 432

(2d Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978). Thus, recusal under 28 U.S.C. § 455(a) is denied. The Court now turns to the defendants' double jeopardy claim based upon the pretrial and trial record.

### (2) *Double Jeopardy*

■ The record before the Court is replete with the efforts of both the Court and the government to protect the rights of the various defendants and avoid the necessity of a mistrial as this complex matter unfolded. The defendants' first motion for a mistrial, before Bonilla testified, was denied. After Bonilla's direct examination, their renewed motion was conditioned by the continued presence of Mr. Salaway in the case. When Mr. Rivera and his counsel were removed from the case a mistrial was seemingly avoided. It was only after Bonilla's confused cross-examination, in which he mentioned "Slalway," that the Court determined to grant defendants' mistrial motions, now made for the third time. Every inference from the objective facts indicates that the clear intent of the Court was to avoid mistrial and it was only after painstaking exploration of every alternative that one was granted.

Nor is it possible to infer that the prosecutor in this case intended "to subvert the protections afforded by the Double Jeopardy Clause." *Kennedy,* 456 U.S. at 676, 102 S.Ct. at 2089. Every possible inference is to the contrary. The prosecutor in this matter cooperated fully with the Court and the parties in an effort to avoid mistrial.

While, in hindsight, the Court might properly have included the other defendants and lawyers in the proceedings concerning potential conflicts between Peter Rivera, Jr. and Mr. Salaway, or notified them of the proceedings prior to trial, the failure to do so does not raise a double jeopardy question. Not only is there no indication that any of the Court's decisions were intended to provoke a mistrial, but the Court's failure to do so did not even cause a mistrial to be "inevitable if the

defense ever learned the facts." (Joy aff. para. 9).

To the contrary, the defense, with full knowledge of all the facts concerning the problems with Peter Rivera's counsel, and after the direct testimony of Bonilla, the third witness, elected to proceed with the trial. At this point, defense counsel had

(1) learned of, asked for, and read a copy of the *ex parte* affidavit of AUSA Mercado;

(2) been informed of the pretrial proceedings and had obtained a court order unsealing them;

(3) received a complete proffer from the government as to what the government believed Bonilla would say, if asked on cross-examination, regarding the alleged subornation of perjury;

(4) been fully informed of the allegations of another witness to the effect that Mr. Salaway had "snorted coke" at the Latin Palace in 1978; and

(5) had an opportunity to consult with the prosecutor, Mr. Salaway, and independent counsel Sagor, regarding all these facts.

The defendants' sole concern at that stage of the trial was that the proceedings not continue with Mr. Salaway in the case. When Peter Rivera's motions to discharge Salaway and for severance and mistrial were granted, their concerns, and their stated basis for the pending mistrial motions, disappeared and the trial proceeded with the cross-examination of Bonilla. It was only the next day, after partial cross-examination of Bonilla, that the defendants moved for an unconditional mistrial on the ground that Bonilla's cross-examination testimony in which he named "Slalway" and alluded to the person who suborned perjury as looking like Mr. Joy, now created a spillover effect on other counsel.

Thus, this was not a case where the defendants were "inevitably" forced or provoked to make mistrial motions by information concealed and then suddenly revealed by the government and the Court. Rather, the motions resulted from a deliberate decision by each defendant, through fully informed counsel and with the benefit of hearing Bonilla's live testimony at trial, to seek the end of this trial prior to judgment and "forgo his valued right to have his guilt or innocence determined before the first trier of fact." *United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978).

### Stay

At this time the Court declines to grant defendants' request for a stay of the proceedings pending appeal. Trial for all five defendants is now set for April 28, nine days away. It is entirely possible that an appeal may be perfected and decided prior to trial and the need for a stay obviated. Counsel have represented that they will appeal promptly on April 21. If defendants' appeal of this decision cannot be completed prior to trial, the Court will entertain motions for a stay or severance.

### Conclusion

There is no basis in the record of this case to depart from the well-established rule permitting reprosecution where a mistrial is granted on the application or with the consent of the defendant. The motions by defendants Pedro Rivera, Sonia Rivera, and August Laguer are denied in all respects.

So Ordered.