THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RENALDO HUDSON, Defendant-Appellant.

First District (2nd Division)   No. 85—3587

Opinion filed *nunc pro tunc* December 29, 1987.

Paul P. Biebel, Jr., Public Defender, of Chicago (Karen A. Popek, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Theodore Fotios Burtzos, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant, Renaldo Hudson, was tried by a jury on three counts of murder, one count of home invasion, and one count each of armed robbery and aggravated arson, all in relation to the stabbing death of Folke Peterson. The jury was unable to reach a unanimous verdict, and a mistrial was declared over defendant's objection.

Defendant thereafter moved to dismiss the charges against him and to bar a retrial or, in the alternative, to bar a death sentencing hearing were he to be convicted of murder upon retrial, on the ground that either retrial or a death penalty hearing would violate his Federal and State constitutional rights against double jeopardy. The

motion was denied.

Notice of an interlocutory appeal pursuant to Supreme Court Rule 604(f) (107 Ill. 2d R. 604(f)) was timely filed on October 15, 1985.

The issues presented for review include whether: (1) instances of prosecutorial conduct during the trial were designed to cause a mistrial; (2) retrial of defendant is barred by the double jeopardy clauses of the Federal and State Constitutions; and (3) those clauses bar a death penalty hearing if defendant is convicted of murder at a second trial.

The evidence at trial revealed that the 71-year-old murder victim had lived on South Kingston Avenue, and defendant lived with his father and aunt at the same address, but in a different apartment. On June 7, 1983, at approximately 7 a.m., defendant reported a fire in the victim's apartment to the fire department, which immediately responded together with police. Inside the smoke-filled apartment police found the victim's sooty and mutilated body lying on a partially burned bed. He had been cut and stabbed about 60 times, which wounds caused his death.

During the investigation, defendant's aunt, Leola Wilson, took Detective Katherine Reardon to her apartment one floor above the victim's apartment. Inside, the aunt revealed a brown plaid bag, a silver tray, a radio, and several other items, which were the victim's property. Defendant's fingerprints were found on the silver tray and radio. The aunt also found defendant's bloodstained jacket behind the sofa bed, rolled up in a brown paper bag. Police asked defendant to accompany them to the police station for questioning. He went voluntarily.

At the police station, defendant was read and waived his *Miranda* rights. He told police that he and his aunt smelled smoke coming from the victim's apartment. He pounded on the victim's door and, when no one answered, he called the fire department. Confronted with the brown plaid bag and the other items, defendant told police that he had bought them from some people and they belonged to him. When told that they belonged to the victim and of his aunt's involvement, defendant confessed.

He told the officers that he often helped his father do janitorial work in that building. On June 6, 1983, he planned to tie up and rob the victim, obtained a rope, knocked on the door at about 7 p.m., and was allowed to enter to fix a light bulb. He grabbed the victim by the neck in a choke hold. The victim had a knife and cut defendant's pinky finger. Defendant took away the knife, stabbed the victim in the stomach, neck and shoulder. The victim laid down on a bed. Defendant asked him for money and was given four blood-soaked bills.

Defendant washed off the blood and asked for more. The victim told him that he had more money in a gold jewelry box on his dresser. Defendant searched for it unsuccessfully for three hours, and then sat next to the victim, watched TV and waited for him to die, which eventuated a little after 3:30 a.m.

Defendant, deciding to make the whole thing look like a burglary, ransacked the apartment and scattered papers and pillow foam all over. He took the victim's brown plaid bag, filled it with several items, left at about 5 a.m. to see his father off to work, returned to the victim's apartment, set it on fire and returned upstairs. His aunt smelled smoke and, after it persisted, he knocked on the victim's door and later called the fire department.

During the time defendant gave his statement he was not handcuffed and acted normally. Thereafter, an assistant State's Attorney went to the police station and took his oral statement, later reduced to writing. After speaking with his aunt for about 10 minutes, defendant gave a court-reported statement and was formally arrested.

Defendant presented the affirmative defense of insanity in his case in chief through the testimony of five lay witnesses: defendant's father, Willie Hudson; his brother, Glenn Hudson; his aunts, Willa Hudson and Leola Wilson; and assistant public defender John McNamara. The first four witnesses set forth evidence of defendant's childhood and adolescence and his mental condition near the time of the offense. Defendant was frequently depressed and withdrawn, preferring to stay by himself rather than play with other children, although at other times he seemed hyperactive. After being shot at age 15 by a brother, defendant suffered from headaches and insomnia and appeared to experience deeper periods of depression as well as periods of extreme excitability, hyperactivity and inattention. He frequently did not make sense after the shooting.

In the winter of 1981, defendant several times reported hearing voices; he had seen a ghost fly over the trailer in which he lived. In the late winter and spring of 1983, defendant appeared to be more depressed and withdrawn than usual; he also had periods of extreme hyperactivity and anger. During the two weeks immediately prior to the murder, including the afternoon before the stabbing, defendant was especially hyperactive, running in and out of the house, unable to sleep much or carry on a conversation, and generally "acting strange." He was unable to concentrate or be attentive for any period of time and complained about headaches and his inability to sleep.

The defense also presented the expert psychiatric testimony of Drs. Helen Morrison and Marvin Ziporyn. Based on his personal ex-

amination of defendant in June 1984, the police reports and photographs in the case, hospital records, reports by other psychiatrists and psychologists who had examined him and the interviews of relatives, Dr. Morrison concluded that on June 7, 1983, defendant was suffering from the mental diseases of major mood disorder, severe depression, a psychosis by which he was not in contact with reality, and a borderline personality disorder. Based on such information, the psychotropic drugs he was taking for the treatment of psychosis while awaiting trial and his two attempts at suicide while in jail, Dr. Morrison also concluded that defendant was not malingering. In her opinion, due to the mental disease or defect which she had described, defendant was unable either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law on June 7, 1983.

Based on his two personal interviews of defendant, one of which occurred shortly after his suicide attempt, and on substantially the same psychiatric, psychological, medical and police reports which Dr. Morrison had considered, Dr. Marvin Ziporyn concluded that on June 7, 1983, defendant was suffering from a mental disease, namely, a major affective disorder of the bipolar, manic-depressive type. In his opinion, on June 7, 1983, although having substantial capacity to appreciate the criminality of his conduct, defendant was mentally ill and unable to conform his conduct to the requirements of the law.

John McNamara testified for defendant, as an assistant public defender who initially represented him. He interviewed defendant on the day of his preliminary hearing and observed that he had no facial expression, his eyes were blank and staring, he did not gesticulate, he spoke in a monotone, and he was "a complete blank." McNamara had difficulty in communicating with defendant in regard to telling him who he was and why he was there. McNamara noticed a notation in his arrest report: "This subject is to be kept under observation!" Defendant was placed in a mental problem jail unit and kept under observation. Two doctors who examined defendant after his suicide attempts said that he was malingering. The defense rested.

The State presented two expert witnesses and two lay witnesses to rebut the insanity defense. Dr. Werner Tuteur testified that defendant had no prior history of hospitalization for mental problems. Defendant told him he had never heard voices and had not seriously intended to commit suicide. Defendant had an antisocial personality, not a mental disease, and could conform his conduct to the requirements of the law. Dr. Albert Stipes testified that defendant had a history of antisocial behavior. His ability to plan the crime, lie to his

aunt, and dispose of the evidence was inconsistent with a mental disease. His claim of amnesia during the murder was also inconsistent with a mental disease. Defendant had taken amphetamines twice per week since he was 14, which could cause excitability, rapid speech, insomnia, loss of appetite, and quite possibly depression. Defendant had smoked 10 marijuana cigarettes on the date of the murder. Dr. Stipes concluded that defendant could appreciate the criminality of his act and was able to control his behavior at the time of the murder.

Assistant State's Attorney Michael Sherwin testified that defendant's aunt told him at the police station that he had never exhibited any unusual or bizarre behavior. Jennette Brown, a neighbor, had a conversation with defendant a few days before the murder in front of their apartment building. He told her that the victim, who was just then leaving the building, probably had a lot of money. Defendant was not hyper or depressed but rather angry at his father, who was not giving him his proper share of money for doing the janitorial work in the building. Defendant's objection to this conversation was overruled. Brown thought defendant was sane.

After closing arguments, the defense sought a mistrial, based upon alleged improper remarks by the State during argument. This motion was denied. The jury deliberated for approximately 14 hours over the course of just under two days and the circuit court declared the jury hung. Defendant's motion for discharge on October 15, 1985, based on double jeopardy, was denied. Defendant filed this appeal.

## I

Defendant contends first that the State intended to cause a mistrial because it had mistakenly accepted a juror who was opposed to the death penalty and could prevent imposition of the penalty. The State's subsequent conduct is characterized as intentional and deliberate toward causing a mistrial and a retrial before a new and more "acceptable" jury.

The State had indicated that it would be seeking the death penalty. A venire was brought into the courtroom of which 14 members were called to sit in the jury box. The circuit court asked the entire venire if anyone could never consider imposing the death penalty under any circumstances. Three persons, including one Sonya Jacobson, said they could not. The court asked them to remain seated.

Prior to commencing the *voir dire*, the court explained the jury selection process to the venire. The court would first conduct *voir dire* of the 12 prospective jurors comprising the panel. Each side would then have an opportunity to accept or excuse any of the 12 ju-

rors, a process which would continue until both sides agreed upon one panel of 12 jurors.

The court proceeded to *voir dire* the prospective jurors, including one James Coughlin, a high school teacher, whose brother was a policeman and who was subsequently accepted by both sides. After nine jurors had been accepted by both sides, the State accepted four more jurors, of whom defendant accepted only two. At this point defendant had only one peremptory challenge left. Four more names were called, including Sonya Jacobson, who reaffirmed her position on the death penalty. She was excused. The three remaining prospective jurors were *voir dired* and were accepted by the defense; however, the State excused them. Of three others *voir dired* by the court, two were accepted by the State and tendered to the defense. At this point, the State had used 13 of its peremptory challenges. Before the defense accepted the panel, juror Coughlin asked the court why Jacobson had been excused and the court answered because she would not consider imposition of the death penalty. Defendant accepted the panel and they were sworn in. Two alternate jurors were *voir dired*, accepted by both sides and sworn.

In defendant's post-trial motion, he alleged that retrial was barred, claiming that the State had engaged in intentional misconduct to cause a mistrial and secure a new jury because Coughlin was opposed to the death penalty. His motion was denied.

■ The double jeopardy clauses of both the United States and Illinois Constitutions provide that no person shall be put in jeopardy twice for the same offense (*People v. Gathings* (1984), 128 Ill. App. 3d 475, 477, 470 N.E.2d 1260), a constitutional policy for defendant's benefit (*United States v. Jorn* (1970), 400 U.S. 470, 479, 27 L. Ed. 2d 543, 553, 91 S. Ct. 547, 554). The double jeopardy clause, however, does not require the State to vindicate its societal interest in the enforcement of the criminal laws in one proceeding under all circumstances. (*Oregon v. Kennedy* (1982), 456 U.S. 667, 672, 72 L. Ed. 2d 416, 422, 102 S. Ct. 2083, 2087.) Reprosecution after a mistrial may be allowed over defendant's objection where justified by "manifest necessity."

■ Defendant contends that Coughlin's question to the court demonstrated his opposition to, or reservations about, applying the death penalty. Nothing in the question demonstrates his unwillingness to consider the death penalty simply because he asked the court to clarify why Jacobson had been excused earlier. If Coughlin had felt the same way as Jacobson he could have so informed the court. The circuit court is in a superior position to ascertain the meaning which a

venireman intends to convey. (*People v. Gaines* (1981), 88 Ill. 2d 342, 357, 430 N.E.2d 1046.) The *voir dire* here was thorough. Coughlin's statement was not such an affirmation of opposition to the death penalty.

■ Assuming, *arguendo*, that Coughlin was opposed to the death penalty, defendant's claim that the State intentionally committed error to force a mistrial in order to secure a better jury fails. Coughlin was fully qualified to determine the defendant's guilt at trial; only the nonimposition of the death penalty is at issue. Coughlin was qualified to determine guilt. He was a high school teacher and his brother was a Chicago policeman assigned to a TACT team. His views on the death penalty were irrelevant at this stage of trial. Further, defendant had not yet indicated whether he would seek to have the court or jury determine the death penalty. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(g), (h).) If it was to be determined by the court, there was no motive for a mistrial. If defendant had sought to have the jury determine the sentencings, the State could have excused Coughlin and either substituted an alternate or sought to have a new jury impaneled for the death phase based upon Coughlin's alleged recalcitrance. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d)(2)(C).) No motive appears for the State to have intentionally committed error.

■ The defense also contends that the State's misconduct during the trial evinced an "intent" to cause a mistrial. The State is alleged to have committed two discovery violations in order to "goad" defendant into requesting a mistrial. In *United States v. Rivera* (2d Cir. 1986), 802 F.2d 593, defendants contended that, because the court held an *in camera* conference prior to trial in their absence, it intended to provoke a mistrial. The court of appeals said that "it borders on the ludicrous to suggest that two weeks prior to trial the judge acted with an intent to provoke the later mistrial motions." (802 F.2d at 600.) Here, the State could have not known ahead of time of the need for a mistrial. Defendant's motion for discovery had been filed about two years before trial. Any discovery violation at that time does not demonstrate an "intent" to cause a mistrial.

■ Defendant also points to his second interview with Dr. Stipes and claims that the State's failure to abide by its agreement during a motion *in limine* not to make reference to it shows an intent to cause a mistrial. The State refrained from mentioning the interviews during its direct examination. On redirect, assuming that defendant had "opened the door" to this evidence during his cross-examination by the defense, the State asked about the second interview, defendant objected to this evidence, but was overruled by the court.

Defendant also bases his theory of the State's intent to cause a mistrial upon questioning concerning defendant's fitness to stand trial, the cross-examination of John McNamara and the State's comments in closing arguments. Each time the State followed the court's rulings; it did not ignore adverse rulings in an effort to elicit forbidden information.

To be noted are two instances when defendant moved for a mistrial. Once defendant made those motions, the State need only to have stood silent, offer nothing in its defense, and reap the harvest of its efforts. Rather, the State resisted both motions for mistrial.

■ Defendant asks that this case be remanded to the trial court for a hearing to determine the existence or absence of prosecutorial "intent" to cause a mistrial, citing *People v. Franklin* (1983), 119 Ill. App. 3d 899, 457 N.E.2d 1005. There, the appellate court remanded the cause to the trial court for a factual finding because prosecutorial intent could not be determined from that record. The present record contains ample objective evidence from which intent can be determined. Further, the circuit court's summary denial of defendant's post-trial motion demonstrates its belief that it was meritless. There is no need for a hearing on this issue in the circuit court. *United States v. Rivera* (S.D.N.Y. 1986), 634 F. Supp. 204, 212.

The record here is devoid of any credible evidence of "intent" by the State to purposefully cause a mistrial. The circuit court's determination to that effect must be affirmed.

## II

Defendant contends that the circuit court improperly declared a mistrial where there was no "manifest necessity" to do so, the jurors did not indicate hopeless deadlock, and the jury had deliberated no more than 12 hours.

During its opening statement, the State told the jury what it believed the facts would show. Defendant, during his opening statement did not dispute those facts and told the jury there was no mystery about them; the main issue was whether defendant was sane at the time the crimes were committed. The trial lasted for five days; however, on the first day an extended lunch period was authorized by the court in order to accommodate defense counsel's request because of his involvement in another trial. Two other days' work were shortened due to other scheduling problems. Eighteen witnesses had testified during this period.

On the fifth day, after closing arguments, the jury retired and commenced deliberations. The circuit court reviewed all the exhibits

and allowed 58 State exhibits to go into the jury room. The jury began deliberations at about 7 p.m. At 9:15 p.m., the court told both sides that, because of a transportation problem, the jury would be brought into the courtroom; the jury would be asked if it was close to a verdict; and, if it was not, the court would sequester the jurors in a hotel for the night because the air-conditioning had been turned off in the courtroom. Defendant agreed; the State did not object. The court feared that, otherwise, continued deliberations under such conditions would result in a forced verdict. The jury was brought out and the foreman reported it was not close to a verdict. The court then instructed the jury to cease deliberations until 10 a.m. the following day.

After returning to court the next day, the jury sought the answer to a question and was brought into the courtroom at 4:45 p.m. The foreman reported the jury was not close to a verdict and then asked if the jury would have any input into the sentencing upon reaching a verdict. The court instructed the jury to concern itself only with reaching verdicts on the various offenses at that point.

The jury was again brought out at 7:10 p.m. and the foreman told the court that the jury could not come to a decision; it was no closer to a verdict than the previous evening; he felt it would be no closer if it was given two more hours to deliberate; and he felt it would never reach a verdict. The court returned the jury to its room. Defendant then requested the *Prim* instruction, to which the court agreed. The court also stated that it would wait until 9 p.m. and, if the jury was no closer to a verdict, it would declare the jury "hung." Defendant did not object, and the State agreed.

At 7:15 p.m., the court read the *Prim* instruction to the jury and told it to continue its deliberations. At 9 p.m., as the court had earlier announced, the jury was brought out. The foreman reported that the jury was no closer than it had been at 7 p.m.; it was no closer than it had been 24 hours earlier; and the foreman did not think that a verdict would be reached if the jury were to deliberate another two hours. The court declared the jury hung. Defendant objected to the discharge. The court asked the defense why they would object when it was obvious that the jury was not going to reach a verdict. The defense agreed there had been a lack of progress, but felt that the foreman had taken a long pause before giving the final answer and that the jury had not been out an inordinately long time. The State characterized the pause as slight and thoughtful. The court reaffirmed its declaration of mistrial.

■■ ■ The double jeopardy clause does not preclude retrial of a

criminal case where the trial is terminated, over defense objection, because of "manifest necessity," the most common form and the prototypical example of which is the hung jury. (*Oregon v. Kennedy* (1982), 456 U.S. 667, 672, 72 L. Ed. 2d 416, 422, 102 S. Ct. 2083, 2087.) Great deference is to be accorded to a declaration of mistrial upon a finding of a deadlocked jury because the circuit court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination of whether the jury will be able to reach a just verdict if it continues to deliberate. (*Arizona v. Washington* (1978), 434 U.S. 497, 510 n.28, 54 L. Ed. 2d 717, 731 n.28, 98 S. Ct. 824, 832 n.28.) Two factors must be taken into consideration: one, if the court discharges the jury when further deliberations may produce a fair verdict, defendant is deprived of his valued right to have his trial completed by a particular tribunal; and, two, if a jury which is unable to reach a verdict after protracted and exhausting deliberations is not discharged, a significant risk occurs that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. The circuit court is entrusted to use a sound judgment in declaring a hung jury. *Arizona v. Washington*, 434 U.S. at 509-10, 54 L. Ed. 2d at 730-31, 98 S. Ct. at 832.

The State's case as to guilt, presented during the first two days, was uncontroverted. Defendant presented only the affirmative defense of insanity. The main issue for the jury to decide was whether defendant was sane when he committed the crimes. Four expert witnesses testified, psychiatrists who, during their testimony, reviewed lay witness evidence, exhibits, reports, and examinations, and then gave their opinions. The jury deliberated several hours the first evening and 11 hours the next day, a total of approximately 14 hours over a two-day period. The jury reported that no progress was made after its initial hours of deliberation on the first evening. The next day, after long deliberation, the foreman advised the court that it would never reach a verdict. Defendant requested that the *Prim* instruction be read to the jury, which was done. The court advised counsel that if the jury was no closer, he would declare it hung. When two hours later the jury returned and indicated it was still no closer, the court asked whether it could reach a verdict if given two more hours. Only after the foreman carefully reflected and then stated that he did not think so did the court declare the jury hung.

■ A reviewing court will not presume an abuse of discretion; instead, our supreme court and other courts have held that "a court of justice is invested with the authority to discharge a jury from giving

any verdict whenever, in the court's opinion, there is manifest necessity for such act or the ends of public justice would otherwise be defeated, and that such is within the discretion of the trial court and is not subject to review in the absence of abuse of discretion." (*People v. DeFrates* (1946), 395 Ill. 439, 446, 70 N.E.2d 591.) In the present case, there was no such abuse.

■■■ Defendant's contention that the foreman never told the court, nor did the court ask, whether the jury was deadlocked on all counts, and that the court never asked the remaining 11 jurors if they were any closer to a verdict after having received the *Prim* instructions, as demonstrating error is baseless. No authority is cited requiring such a procedure, particularly where, as here, the defense made no such request. Indeed, in *People v. Hill* (1978), 65 Ill. App. 3d 879, 885, 382 N.E.2d 881, the court held that a trial judge cannot be required to seek out partial verdicts *sua sponte*. If defendant wanted to know from the foreman if the deadlock applied to all counts or have the jurors questioned individually, he should have so requested. He did not seek to have these questions asked, and made no mention of them when the court asked why he had objected to the discharge. The instant record discloses no motive for mistrial other than the jury's inability to agree. The circuit court's ruling that defendant must stand trial again is affirmed.

### III

Defendant urges that the death penalty cannot be sought here since the first jury was declared hung because it failed to agree upon a unanimous verdict of guilty; however, three jurors "found" him guilty but mentally ill and, therefore, he was acquitted of the death penalty. This argument is based upon the jury foreman's statement to defense counsel, one hour after the jury was declared hung, that nine jurors favored a verdict of guilty, but three favored a verdict of guilty but mentally ill.

■■■ It is clear that three members of a jury cannot make a "finding" that a defendant was guilty but mentally ill; a hung jury does not make "findings." A finding is the final unanimous decision reached by the court or jury. A mistrial is no trial at all (*Smock v. Williamson* (1967), 80 Ill. App. 2d 218, 223 N.E.2d 741), but a nullity from which no finding arises. A hung jury is defined as "[a] jury so irreconcilably divided in opinion that they cannot agree upon any verdict." (Black's Law Dictionary 667 (5th ed. 1979).) The fact that three members of the hung jury held the opinion that defendant was guilty but mentally ill did not rise to the dignity of a finding. A finding can

be made only by a unanimous jury, not individual jurors. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(o).) In *People v. Bean* (1976), 64 Ill. 2d 123, 126, 355 N.E.2d 17, after a unanimous jury signed a verdict form on one count, but could not agree on the second count, it was declared hung. The jury did not inform the court that it had reached a verdict on one count. Our supreme court held that the signed verdict form did not constitute a finding of the jury; a jury only makes a finding after all members reach a verdict, sign the verdict form and present it in open court. The same reasoning and result obtains here.

■■ Significantly, up to and including the time that the jury in the present case was declared hung, defendant had not yet indicated that he wanted a jury or the court to determine sentencing and it was then unknown whether this jury would have determined sentencing. The mere possibility that this jury might have heard the sentencing phase is insufficient for double jeopardy to attach. At this stage, the State could have declined seeking the death penalty. The point of no return had not been reached. Even were we to assume that juror Coughlin was opposed to the death penalty, as defendant contends, and the State pursued such a penalty, this jury would not have determined the sentencing. No death penalty hearing was ever held at the first trial. This would have required a "separate sentencing hearing" where matters in aggravation and mitigation would have been presented to, and evaluated by, the sentencer. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(d) through (h).) Evidence would have been presented in this hearing that would not have been heard at trial. (*People v. Ramirez* (1983), 98 Ill. 2d 439, 465-66, 457 N.E.2d 31.) The jury here, during the guilt phase, was not presented with, did not consider, and could not have unanimously found that there were no mitigating factors sufficient to preclude a death sentence. Ill. Rev. Stat. 1983, ch. 38, par. 9—1(g).

Accordingly, we hold that a death penalty hearing can be held if the defendant is found guilty because there was no hearing at the first trial and jeopardy had not attached. Although the State and the defense discuss the possibility of defendant being found guilty but mentally ill, and discourse upon whether the death penalty may be imposed in such an event, that issue is not ripe for decision since such a finding, as we have held, has not been made by a jury.

Affirmed and remanded for trial.

SCARIANO, P.J., and STAMOS, J., concur.