(No. 71144.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RENALDO HUDSON, Appellant.

*Opinion filed November 18, 1993.—Rehearing denied January 31, 1994.*

412

414

MILLER, C.J., joined by FREEMAN and McMORROW, JJ., concurring.

Charles M. Schiedel, Deputy Defender, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

On June 13, 1983, defendant, Renaldo Hudson, was charged by indictment in Cook County with four counts of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)), armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2), unlawful restraint (Ill. Rev. Stat. 1983, ch. 38, par. 10—3), aggravated arson (Ill. Rev. Stat. 1983, ch. 38, par. 20—1.1), residential burglary (Ill. Rev. Stat. 1983, ch. 38, par. 19—3), two counts of home invasion (Ill. Rev. Stat. 1983, ch. 38, par. 12—11), and three counts of armed violence (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2). At the conclusion of defendant's trial in 1985, a mistrial was declared when the jury could not reach a unanimous verdict. Following defendant's unsuccessful interlocutory appeal, the cause was remanded for a new trial. *People v. Hudson* (1987), 171 Ill. App. 3d 1029.

On remand, defendant was convicted of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)), armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2), and aggravated arson (Ill. Rev. Stat. 1983, ch. 38, par. 20—1.1). The same jury that convicted defendant found that he was eligible for the death penalty under section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)). After the jury found no mitigating factors sufficient to preclude the imposition of the death penalty,

the trial court accordingly sentenced defendant to death. Defendant's death sentence was stayed (134 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603).

On appeal, defendant raises numerous issues which can be generally categorized as errors concerning: jury selection, improper cross-examination of the psychiatrist who testified on behalf of defendant, improper prosecutorial remarks regarding defendant's insanity defense, the admission of defendant's confession, the absence of material witnesses to the confession, improper closing arguments, jury instructions, and whether he was deprived of a fair sentencing hearing. In addition, defendant challenges the constitutionality of the Illinois death penalty statute. We shall expand upon each allegation of error as required in the course of this opinion.

## FACTS

The State presented the following evidence at defendant's trial. Prior to his death, the victim, 71-year-old Folke Peterson, had lived in apartment 303 at 7458 South Kingston in Chicago. Defendant lived in apartment 404 in the same building together with his father and aunt, Leola Wilson. In his confession, defendant indicated that he learned from his father, who performed janitorial duties in the building, that the victim had a light fixture in his apartment that needed repair. On the evening of June 6, 1983, defendant decided to rob the victim. Defendant devised a plan to enter the victim's apartment under the pretense of fixing the broken light. Defendant brought rope with him so that he could tie up the victim.

Around 7 p.m., defendant knocked on the door of the victim's apartment. The victim admitted him into the apartment and asked defendant to fix the light. As defendant stood on a chair and pretended to fix the

light, he asked the victim for a tool. While the victim's back was turned, defendant attacked him from behind and caught him in a choke hold. Defendant then stabbed the victim in the abdomen, and slashed him from his waistline to his throat. He then proceeded to repeatedly stab the victim in the shoulder and the neck.

As the victim lay on his bed bleeding, defendant asked him for money. The victim gave him four single blood-soaked dollar bills. Defendant asked for more money, and the victim told him to look in a gold jewelry box on the dresser. After defendant was unable to locate the jewelry box, the victim tried to get up to show it to him; however, he was bleeding too profusely to move by that time. Nonetheless, the victim continually told defendant to take anything he had, as he pleaded with him not to kill him. Defendant searched for the jewelry box for three hours to no avail. Finally, he turned on the television and sat down on the bed next to the victim as he watched him die. At approximately 1 a.m., defendant became irritated at the victim for continually repeating a German word. Although the victim was near death, defendant continued to repeatedly stab and torture him because he figured that an attempted murder charge was just as serious as a murder charge.

After the victim finally died around 3:30 a.m., defendant decided to make it look as though a burglary had occurred by ransacking the apartment. He then decided to set the apartment on fire. First, he stuffed paper around the victim's body. He then tore apart a foam rubber pillow and placed it in different parts of the apartment and on the bed with the victim. By that time, it was almost 5 a.m., and defendant realized that his father would soon be getting up and ready for work. Thus, after defendant prepared to set the victim's apartment on fire, he returned to his own apartment with various items in a brown plaid bag that he took from the victim. His jacket

was spotted with the victim's blood, so he took it off and stuffed it into a bag which he hid behind the couch in his apartment.

When his father left for work, defendant returned to the apartment and set the victim's body and apartment on fire. He then returned to his own apartment. His aunt remarked that she smelled smoke, and insisted that they go down to the victim's apartment. When the victim did not answer the door, they called the fire department.

On the morning of June 7, 1983, at approximately 7 o'clock, Detective Michael Porchordo responded to a call to investigate a death and arson at 7458 South Kingston. Accompanied by his partner, Detective Catherine Reardon, the officers found the victim's apartment in complete disarray. The victim's mutilated and partially burned body was lying on the bed, with five severe, deep lacerated wounds extending from his waistline up to the upper torso of the chest. The victim had multiple stab wounds in his chest, face, and arms. His nose had been partially severed, and the entire left side of his throat had been cut from behind the ear to the thorax. The victim's left elbow and finger had also been partially severed. The shirt worn by the victim was ripped open, and the pants were water-soaked with the pockets pulled inside out.

Detective Reardon began to canvass the building for witnesses and additional information regarding the fire and death of the victim. Leola Wilson, defendant's aunt, approached Detective Reardon, and asked her to follow her back to her apartment. Wilson showed Detective Reardon old watches, several items of silverware, and a decanter brought into the apartment by defendant which purportedly belonged to the victim. Wilson also showed Detective Reardon a brown paper bag hidden behind a couch containing a jacket that appeared to be stained

with blood. After Detective Reardon finished gathering information, defendant was asked to go to the police station for an interview.

After the officers twice confronted defendant with the victim's belongings found in defendant's apartment, defendant confessed to killing the victim. Assistant State's Attorney Michael Sherwin met with defendant and informed him of the *Miranda* warnings. A court-reported confession was given by defendant to Sherwin.

Dr. Edmund Donoghue, a Cook County medical examiner, performed an autopsy on the victim's body. Dr. Donoghue found 60 stab wounds on the victim's body, including numerous defensive injuries. In addition, the victim sustained two internal hemorrhage skull wounds which were unrelated to the numerous stab wounds.

The parties stipulated that the victim's and defendant's fingerprints were found on the metal tray recovered from defendant's apartment. Another stipulation indicated that the victim's blood was consistent with the blood found on defendant's pants, that the stain on defendant's jacket was human blood, and that a bloodstain on a swatch of the victim's bed linen was consistent with a ribbing pattern on the cuff of defendant's jacket.

Defendant attempted to establish the affirmative defense of insanity. Dr. Marvin Ziporyn, a psychiatrist, testified on defendant's behalf. Dr. Ziporyn testified that, at the time of the murder, defendant was suffering from bipolar disorder, a mental disease formerly known as manic-depressive illness. During the manic phase of this disorder, a person is excitable, distractible, agitated and impulsive. However, the depression phase consists of unhappiness so severe that it borders on being suicidal. He diagnosed defendant as suffering from bipolar disorder because defendant had a history of mood swings and depression. According to Dr. Ziporyn, analysis of the crime

demonstrated defendant's erratic behavior, which was characteristic of bipolar disorder. Dr. Ziporyn opined that defendant appreciated the criminality of his conduct, but was unable to conform his conduct to the requirements of the law at the time he murdered the victim.

On cross-examination, the State questioned Dr. Ziporyn about the numerous times he testified on behalf of defendants in the past 10 years, his association with Richard Speck (a notorious serial murderer), his awareness of the fact that several other psychiatrists had interviewed defendant and found him to be malingering, and Dr. Ziporyn's philosophy that defendants should not be punished for their actions.

Defendant's half-brother, Anthony Turner, gave testimony regarding defendant's childhood and family background. Turner testified that defendant's twin brother died falling down a flight of stairs when defendant was seven years old. When defendant was 15, another brother shot defendant and killed two other relatives. Following that incident, defendant was subdued and kept to himself.

In the State's rebuttal case, Jennette Brown, who lived in the same apartment building, testified that a few days prior to the murder defendant told her that he was going to become friends with the victim because he knew he had money.

Dr. Albert Stipes, a forensic psychiatrist, also testified in rebuttal. Dr. Stipes examined defendant shortly after the murder. Based upon his interview and reports available to him, Dr. Stipes believed that defendant was able to conform his conduct to the requirements of law. He further concluded that defendant's suicide attempt was an adjustment disorder and a temporary condition from stress. He diagnosed defendant as suffering from situational depression, but found no evidence of psy-

chosis. Rather, Dr. Stipes testified, defendant's statements during his interview showed an attempt to cover up the murder.

Dr. Stipes examined defendant again in 1985, and concluded that defendant was suffering from an antisocial personality and substance abuse. Dr. Stipes believed that defendant did not suffer from bipolar disorder because his examination of defendant's jail records after 1985 showed no evidence of any mental health problems. Dr. Stipes found defendant fit to stand trial and sane at the time of the murder. Dr. Werner Tuteur also testified in rebuttal that he concurred with Dr. Stipes' diagnosis that defendant had an antisocial personality, and that he was not insane at the time of the murder.

The jury was instructed on the defense of insanity and the verdict of guilty but mentally ill. Defendant was found guilty of murder, armed robbery and aggravated arson. At the eligibility phase of the death penalty hearing, the jury found that defendant was 18 years old or older at the time of the murder for which defendant was convicted, and that he had committed murder in the course of a felony, *i.e.*, armed robbery. Thus, the jury found defendant eligible for the death penalty. Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6).

In aggravation, the State presented evidence that, while a juvenile, defendant was arrested on three different occasions and had been charged with armed robbery and aggravated assault. Charles Mitchell, an investigator with the Cook County department of corrections, testified that an informant told him that defendant and six inmates were planning an escape from jail; however, the escape was prevented after a search uncovered evidence to support the plan. Other testimony by correctional officers revealed that defendant had 20 disciplinary reports during his incarceration, including two escape attempts.

In mitigation, Imelda Benson, defendant's former teacher, testified that she did not think defendant was capable of performing this crime. Reverend Andy Gonlaez, a jail chaplain who has known defendant for three or four years from jail worship services, stated that jail inmates have homemade knives in order to protect themselves from gangs or each other. Anthony Turner, defendant's half-brother, testified that after their parents separated, defendant went to live with his father. Defendant's father left him with various relatives, who mistreated him. Turner stated that defendant was a good kid who did not get into trouble. Finally, David Randall, a sentencing consultant who interviewed defendant and his family members, testified about the dysfunctional nature of defendant's family life. While living with his aunt and uncle, defendant was whipped with a piece of lumber. According to Randall, defendant received no psychological counseling after either the accidental death of his twin brother or the shooting rampage by his brother William, which left two relatives murdered and defendant and several relatives injured.

The jury unanimously found that there were no mitigating factors sufficient to preclude a sentence of death. Accordingly, the trial court imposed a sentence of death.

## JURY SELECTION

Defendant first contends that he was denied equal protection under the fourteenth amendment when the prosecutor engaged in purposeful racial discrimination by exercising peremptory challenges to exclude black venirepersons from the jury. Specifically, defendant contends that the State exercised 7 of its 11 peremptory challenges to exclude black venirepersons. (We note that two black individuals were seated on the jury.)

The State contends that defendant has waived this issue for review by his failure to make a timely objection

at trial. It is well-established that both an objection at trial and a written post-trial motion raising the issue are necessary to preserve an alleged error for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Moreover, this court has held that an objection to the use of peremptory challenges should be brought before the jury is sworn. (*People v. Evans* (1988), 125 Ill. 2d 50, 61-62.) Since the defendant here did not raise a *Batson* motion until after the jury was sworn, the issue is waived. However, this court has long recognized that the " 'responsibility of a reviewing court for a just result and for the maintenance of a sound and uniform body of precedent may sometimes override the considerations of waiver that stem from the adversarial nature of our system.' " (*People v. Wilson* (1993), 155 Ill. 2d 374, 379, quoting *American Federation of State, County & Municipal Employees, Council 31 v. County of Cook* (1991), 145 Ill. 2d 475, 480.) In light of the importance of the constitutional claim raised by defendant, we choose to review this issue in the interest of justice.

In *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, the Supreme Court held that the equal protection clause of the fourteenth amendment prohibits the State from using peremptory challenges to strike potential jurors solely on the basis of their race. *Batson* established a three-step analysis to determine whether or not the State used its peremptory challenges to remove venirepersons on the basis of race. First, a defendant must establish a *prima facie* case of purposeful discrimination in the State's exercise of its peremptory challenges. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.) A *prima facie* showing of discrimination under *Batson* requires that a defendant demonstrate that "relevant circumstances" in the case raise an inference that the prosecutor exercised peremptory challenges to exclude venirepersons from the jury on ac-

count of their race. *People v. Andrews* (1992), 146 Ill. 2d 413, 424.

For purposes of establishing a *prima facie* case, "relevant circumstances" include: (1) a pattern of strikes against black venirepersons; (2) a disproportionate use of peremptory strikes against black venirepersons; (3) the level of black representation in the venire as compared to the jury; (4) the prosecutor's questions and statements during *voir dire* and while exercising peremptory challenges; (5) whether the excluded black venirepersons were a heterogeneous group sharing race as their only common characteristic; and (6) the race of the defendant, victim and witnesses. (*Evans*, 125 Ill. 2d at 63-64; *People v. Mahaffey* (1989), 128 Ill. 2d 388, 413.) This court has determined that the trial court's decision as to the *prima facie* case will not be overturned unless it is against the manifest weight of the evidence. *Andrews*, 146 Ill. 2d at 425; *People v. Henderson* (1990), 142 Ill. 2d 258, 287.

Once the trial court determines that a defendant has made a *prima facie* showing, the burden shifts to the State to provide a "clear and reasonably specific" race-neutral explanation for challenging each venireperson in question. (*Batson*, 476 U.S. at 97 n.20, 90 L. Ed. 2d at 88 n.20, 106 S. Ct. at 1723 n.20.) The trial court's determination on the ultimate issue of discrimination is a finding of fact which turns on an evaluation of credibility and, therefore, is entitled to great deference on appeal (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21) and will not be reversed unless it is clearly erroneous (*Hernandez v. New York* (1991), 500 U.S. 352, 369, 114 L. Ed. 2d 395, 412, 111 S. Ct. 1859, 1871; *People v. Ramey* (1992), 151 Ill. 2d 498, 519; *People v. Hope* (1992), 147 Ill. 2d 315, 321).

The first consideration in the instant case is whether defendant established a *prima facie* case. Defendant con-

tends that the preliminary issue of whether defendant has made a *prima facie* showing becomes moot where the trial court fails to determine whether a *prima facie* case has been made, the State offers an explanation for the peremptory challenge and the trial court rules on the ultimate question of intentional discrimination. (*Hernandez v. New York* (1991), 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859.) In *Hernandez*, the prosecutor defended his use of peremptory challenges before the trial court was able to rule on whether a *prima facie* case of discrimination had been established. The State offered its explanation without any prompting from the trial court. The Court held: "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot." *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.

The State counters that the issue is not moot because the State provided an explanation for its peremptory challenges only after the trial court prompted it to do so, and that the *Hernandez* decision is distinguishable because the prosecutor in that case offered an explanation without prompting by the trial court thereby depriving the court of the opportunity to rule on the issue. We disagree.

The trial court never determined whether defendant established a *prima facie* case under *Batson*. Rather, the trial judge found only that he did not see a "systematic exclusion" based on race, and that the State articulated reasons other than race for dismissing the jurors. However, this court has recently held that once the trial court rules on the ultimate question of discrimination, the question of whether the defendant established a *prima facie* case became moot. (*People v. Mitchell*

(1992), 152 Ill. 2d 274, 289-90.) Moreover, the trial judge was not applying an improper standard in his referral to "systematic exclusion." Instead, the trial court responded to the argument set forth by defendant who initially referred to a "systematic method of exclusion." Pursuant to *Hernandez*, the question of whether defendant in the instant case established a *prima facie* case of discrimination became moot when the trial court found the State's explanations were valid.

Accordingly, we need only review the trial court's ruling that the State's proffered reasons for challenging particular venirepersons were race-neutral. A neutral explanation is an explanation based on something other than the race of the venireperson. (*Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.) Because the trial judge's finding constitutes a credibility determination, it should be given great deference (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21) and will not be overturned unless it is clearly erroneous (*Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871).

Defendant contends that the prosecutor allegedly exercised seven peremptory challenges to exclude black venirepersons. However, at the *Batson* hearing, defendant only established the race of the following four excluded black venirepersons by identifying them by name: Frances McBee, Lula Mae Sykes, Allen Kosby, and Carl Reynolds. Careful reading of the prosecutor's explanation at the *Batson* hearing reveals that excluded venireperson Robin Praser was also black. While defendant also challenges the exclusion of two other venirepersons, there is no evidence in the record establishing their identity or race. (See *Evans*, 125 Ill. 2d at 62.) Since the defendant asserting the *Batson* claim has the burden of preserving the record, any ambiguities are construed against that defendant. (*Henderson*, 142 Ill. 2d at 279-

80.) Keeping these principles in mind, we will examine the State's explanation for excluding the following venirepersons: Carl Reynolds, Allen Kosby, Lula Mae Sykes, Frances McBee, and Robin Praser.

## CARL REYNOLDS

The State explained that it excluded Reynolds because he failed to disclose his criminal history to the trial court on his jury card. The State obtained this information by obtaining the criminal history sheet on Carl Reynolds. According to his criminal history sheet, he was arrested for theft and shoplifting by a Chicago police officer. The State was concerned about his lack of candor and whether he would hold anything against Chicago police officers, who were witnesses in this case. Concealment of a prior criminal charge is a sufficient race-neutral reason for the State to exercise a peremptory challenge. There is no claim by defendant that this reason is a pretext for discrimination since none of the white jurors possessed this characteristic.

## ALLEN KOSBY

In explaining the peremptory challenge against Kosby, the State contends that it excluded him because his brother was murdered. The State was concerned about his ability to consider the death penalty as an appropriate punishment since his brother's murderer did not receive such a severe penalty. The State also excluded Kosby because he was inappropriately dressed for the courtroom. The trial court found that the State's explanation was race-neutral, and defendant offers no persuasive reason for this court to reject the trial court's finding.

## LULA MAE SYKES

The State next explained that it exercised a peremp-

tory challenge against Sykes for two reasons: (1) she had two brothers who were murdered; and (2) she gave a less than positive answer when asked if she could follow the law. The State feared that she might be reluctant to consider the imposition of the death penalty since it was a more severe punishment than that received by her brothers' murderers. The record reveals that only one brother was murdered while the other was killed by lightning. Nevertheless, the trial court found the combination of these factors to be a legitimate and neutral reason for exercising a peremptory challenge against this juror. Although defendant claims that the State's explanation was pretextual, he offers no evidence or argument in support of that claim. The trial court was in the best position to evaluate the demeanor of this venireperson and the State's explanation for excluding her. There is no basis for this court to find that the trial court erred in accepting the State's reasons for excluding Sykes.

## FRANCES McBEE

The State based its peremptory challenge against McBee on the following grounds: (1) McBee's aunt was under psychiatric care and there would be psychiatrists testifying for the State in this case; (2) she was inattentive during questioning by the judge; and (3) she was inappropriately dressed for the courtroom.

Defendant contends that the State's reliance on a family member's being under psychiatric care as a reason for striking McBee is pretextual because the State accepted as jurors Louis MacDonald, Alfreda Beherns, Charles Hiterlider, and Loretta Buchanan, all of whom had family members that had undergone psychiatric care. Initially, we note that since MacDonald was excused for cause by the judge and thus did not serve on the jury, he will not be considered by this court in deter-

mining whether the State's explanation is legitimate and race-neutral.

Moreover, the mere fact that the State challenges a black venireperson for a reason which is equally applicable to a white juror does not show in and of itself that the offered explanation is pretextual. This court has held:

> "[I]n many instances there will be no single criterion that serves as the basis for the decision whether to excuse a particular venireman. A characteristic deemed to be unfavorable in one prospective juror, and hence grounds for a peremptory challenge, may, in a second prospective juror, be outweighed by other, favorable characteristics." (*People v. Mack* (1989), 128 Ill. 2d 231, 239.)

Consequently, a peremptory challenge may be based on a combination of traits. A particular trait that justifies exclusion of a venireperson can be acceptable in a juror who has a different combination of traits which distinguish that juror from those peremptorily challenged. For example, a venireperson possessing an unfavorable trait may be accepted as a juror while another venireperson possessing that same negative trait, but also possessing other negative traits, may be challenged. *Mitchell*, 152 Ill. 2d at 295.

In this case, one of the factors relied on by the State to exclude McBee was that she had a family member undergoing psychiatric care. This is the only factor, however, which McBee shared with jurors Beherns, Hiterlider, and Buchanan. Because the State relied on a combination of factors to exclude McBee, she was not similarly situated with the white jurors. McBee possessed other undesirable traits which distinguished her from these jurors. McBee was inattentive during *voir dire* and sloppily dressed. Furthermore, McBee had a son physically injured as a result of a violent crime. These distinguishing characteristics were sufficient to

explain the State's alleged inconsistency in accepting Beherns, Hiterlider, and Buchanan as jurors while rejecting McBee. When viewed together, the State's reasons are legitimate and race-neutral.

Defendant further contests the State's contention that McBee believed her aunt's psychiatric care had been unsuccessful. Defendant argues that this contention is false and a mere pretext for excluding McBee from the jury. Defendant contends that McBee offered no opinion as to the success of her aunt's psychiatric care. Although McBee may not have given an opinion as to her aunt's care, the State's concern was not simply McBee's connection with a psychiatrist. This factor, in conjunction with the other factors previously cited, prompted the State to challenge her. The combination of undesirable traits likewise distinguishes McBee from the jurors. As a result, we reiterate that the State's explanation in regard to McBee's exclusion is not pretextual.

## ROBIN PRASER

The State explained the exclusion of Praser on the following grounds: (1) her unemployment; (2) inappropriate demeanor; (3) lack of attention to detail and instructions; and (4) the fact that the State sought more men to balance out the jury. We find these reasons to be valid.

During *voir dire*, Praser admitted that she had been unemployed for several months. The State believed that working people have more of a stake in the community. Unemployment has been held to be a sufficiently race-neutral reason for excluding a venireperson. (*People v. Smith* (1992), 236 Ill. App. 3d 812, 817; *People v. Lovelady* (1991), 221 Ill. App. 3d 829, 838.) We agree. Although the record shows that juror Alfreda Behern was retired, we find that retirement is distinguishable from unemployment.

Aside from her unemployment, the State explained that Praser's demeanor was inappropriate since she was inattentive during *voir dire*. Moreover, the State pointed out that since she did not completely fill out her jury card, Praser lacked attention to detail and instructions. This court has held that demeanor and body language constitute legitimate race-neutral reasons for exercising peremptory challenges. (*People v. Young* (1989), 128 Ill. 2d 1, 20; see *People v. Harris* (1989), 129 Ill. 2d 123, 176.) Explanations based on such factors "must be closely scrutinized because they are subjective and can be easily used by a prosecutor as a pretext for excluding persons on the basis of race." (*Harris*, 129 Ill. 2d at 176.) Nevertheless, we must recognize that a trial judge is in the best position to observe the demeanor of potential jurors and then evaluate the prosecutor's explanations for exercising a peremptory challenge. (*Young*, 128 Ill. 2d at 21.) Given the great deference accorded to the trial court's ruling, which is based largely on an assessment of the State's credibility, we cannot say that the trial court's ruling was clearly erroneous.

The final factor relied on by the State was Praser's gender. Since the jury had more women than men, the State sought men to balance out the jury. Defendant contends that the State's rationale for desiring more men to balance out the jury was pretextual since the next two venirepersons accepted by the State were women, namely Diane Nummy and Maria Mentanis. We note, however, that although Nummy, Mentanis and Praser shared a trait which the State regarded as undesirable, only Nummy and Mentanis possessed another trait which the State believed made them desirable as jurors. (See *Young*, 128 Ill. 2d at 23-24.) Unlike Praser, Nummy and Mentanis were employed. Consequently, the fact that Nummy and Mentanis were female was outweighed by

their employment, which made them desirable to the State as jurors and distinguished them from Praser.

In sum, we find that no discriminatory intent is inherent in the State's explanation for excluding Reynolds, Kosby, Sykes, McBee, and Praser. Accordingly, we deem the State's reasons to be valid and race-neutral.

Finally, we consider defendant's procedural challenge to the trial court's *Batson* analysis. Defendant argues that the trial judge erroneously failed to render factual findings reflecting his own evaluation of the stricken venirepersons and the State's explanation for excluding such venirepersons. Defendant contends that lack of such findings resulted in an improper *Batson* proceeding. We disagree. In *People v. Mack* (1989), 128 Ill. 2d 231, 245-46, this court held that, where the trial judge found the State's explanation to be race-neutral, there was no further need for the trial judge to enter findings with respect to each black venireperson excluded by the State. After carefully reviewing the evidence, we conclude that the trial court's finding of no intentional discrimination was not clearly erroneous. Accordingly, we reject defendant's *Batson* claim.

## TRIAL ISSUES

We now focus our attention upon defendant's allegations of error committed at trial, beginning first with the prosecution's cross-examination of Dr. Ziporyn. Defendant asserts that the prosecutor made irrelevant and prejudicial references to Dr. Ziporyn's prior association with Richard Speck which deprived him of a fair trial. Although the State claims waiver, we find that defendant preserved this issue for review by raising it in a motion *in limine* and in his post-trial motions. *People v. Boclair* (1989), 129 Ill. 2d 458, 476 (an issue is preserved for appeal if there has been either an objection at trial or it

has been raised in a motion *in limine,* and it is also raised in the post-trial motion).

Moreover, we find that the trial court should have granted defendant's motion *in limine* to prohibit the prosecutor from making any reference to Dr. Ziporyn's relationship with Richard Speck. The prosecutor's references to Richard Speck were irrelevant and thus improper. However, it is well settled that the scope of cross-examination is largely within the trial court's discretion and that its rulings will not be overturned unless an abuse of that discretion results in manifest prejudice to the defendant. (*People v. Wright* (1985), 111 Ill. 2d 128, 149.) In the instant case, there has been no showing that any of the references to Richard Speck influenced the jury and resulted in substantial prejudice to defendant. We therefore conclude that the prosecutor's references to Richard Speck were not sufficiently prejudicial to constitute reversible error.

Defendant also contends that he was denied a fair trial because the prosecution improperly attacked the credibility of Dr. Ziporyn and his diagnosis. Defendant contends that the prosecution's cross-examination of Dr. Ziporyn consisted of insinuations, unsupported by the evidence at trial, that the defense had unsuccessfully sought the assistance of another psychiatrist to present an insanity defense before the defense found Dr. Ziporyn.

In general, any permissible kind of impeaching matter may be developed on cross-examination since one of the purposes of cross-examination is to test the credibility of the witness. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 454.) Nevertheless, this court has found it improper for the prosecutor to ask a witness questions for purposes of impeachment unless the prosecutor is prepared to offer proof of the impeaching information. (*People v. Olinger* (1986), 112 Ill. 2d 324, 341.) In this case,

the prosecution sought to discredit Dr. Ziporyn's testimony by insinuating that the defense needed to shop around to find a psychiatrist who would testify that defendant was not guilty by reason of insanity. Defendant argues that this impeachment was improper because the prosecution did not present evidence to support this insinuation. However, defendant's failure to raise this issue in his post-trial motions results in waiver upon review. *Enoch*, 122 Ill. 2d at 186.

Defendant urges this court, nonetheless, to review this issue under the plain error rule. The plain error rule can be invoked in instances where the evidence is closely balanced, or where the error is of such magnitude that it deprived the defendant of a fair trial. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; *People v. Fields* (1990), 135 Ill. 2d 18, 60.) Neither of these circumstances is present in this case. The evidence relating to defendant's sanity and guilt was not closely balanced, nor was the alleged error so prejudicial as to affect the overall fairness of the trial. The prosecution's questions did not alter Dr. Ziporyn's ultimate opinion that defendant was insane at the time of the murder. Accordingly, we conclude that any impropriety in the prosecution's cross-examination of Dr. Ziporyn did not rise to the level of plain error.

Relatedly, defendant contends that the prosecution carried the unsupported insinuations from cross-examination into closing when the prosecutor argued that the defense "shopped for another eight months" for a psychiatrist and finally "hit the bottom of the barrel when they picked up Marvin Ziporyn." Again, defendant's failure to raise this issue in his post-trial motions results in waiver upon review (*Enoch*, 122 Ill. 2d at 186), and the plain error rule is inapplicable.

## CONFESSION

As a preliminary matter, defendant alleges that his

confession was given involuntarily, and that he is entitled to a new suppression hearing because the State failed to produce all material witnesses to the confession. In particular, defendant claims that the State should have called as witnesses Assistant State's Attorney Sherwin, Leola Wilson, the officers who transported defendant to the police station, and the court reporter who took defendant's statement. However, this court recently held in *People v. R.D.* (1993), 155 Ill. 2d 122, that a trial court's ruling on a motion to suppress will not be reversed simply because the State failed to call all material witnesses at the suppression hearing, so long as it can meet its burden of proving the confession voluntary. Therefore, in view of our decision in *R.D.*, we must reject defendant's claim that he is entitled to a new suppression hearing simply because the State failed to call all material witnesses at the suppression hearing.

Defendant also implicitly argues that the State failed to sustain its burden of proving that his confession was voluntary. In the motion to suppress, defendant maintained that his statements to the police were involuntary because they were the product of physical and psychological coercion, and that he was incapable of intelligently waiving his *Miranda* rights. Defendant claims that he was verbally and physically abused, and that he was threatened by the police; however, during the suppression hearing he testified that the police did not strike, mistreat or threaten him. In addition, Detectives Porchordo, Hood, Evans, and Reardon testified that no one in their presence ever used any physical, psychological or mental coercion against defendant.

We are also unpersuaded by defendant's argument that he was unable to understand or waive his *Miranda* rights. Detective Reardon testified that defendant indicated that he understood his *Miranda* rights prior to agreeing to make a statement. Defendant testified at the

suppression hearing that he understood his conversations with Detectives Porchordo and Reardon. The only evidence offered in support of defendant's claim was Dr. Rosenwald's testimony that defendant would have difficulty in understanding *Miranda* warnings. Dr. Rosenwald admitted, however, that he did not question defendant about the *Miranda* warnings.

After reviewing the testimony adduced at the suppression hearing, we cannot conclude that the trial court's decision to deny defendant's motion to suppress the confession was contrary to the manifest weight of the evidence.

Defendant's next claim of error concerns the publication of his confession to the jury. Defendant raises three challenges to the publication of the confession, namely: (1) the confession read to the jury contained a false statement; (2) the trial court sent the unredacted portion of the confession to the jury; and (3) the prosecutor made improper arguments with respect to the confession. We will examine each of these claims individually.

We first examine defendant's contention that he was prejudiced because a false statement was included in the confession. During the trial, Assistant State's Attorney Michael Sherwin testified that defendant's statement to the police was transcribed by a court reporter and then given to defendant to read and sign. Defendant crossed out that portion of the statement in which he indicated that he pulled out a knife during his struggle with the victim, and changed it to read that it was the victim who first pulled out the knife. The entire statement was read to the jury, including the portion which defendant had crossed out and the correction which defendant had inserted.

A defendant's confession, if voluntary, is admissible evidence. (See *People v. Hoffman* (1942), 381 Ill. 460, 465.) At the conclusion of the suppression hearing, the

trial judge found the confession to be voluntary; as such, it was properly admissible. Defendant claims, however, that the crossed-out statement was not part of the confession, but was simply a mistake by the court reporter. Under the circumstances of this case, we conclude that the trial court did not abuse its discretion when it permitted the State to read both the crossed out and the corrected statements to the jury to dispel any confusion by the jury when examining the transcript of defendant's confession, which the court indicated it would send to the jury.

Similarly, defendant contends that the trial court erred in sending the entire confession to the jury, which included the crossed-out statement at issue. It is well-established that whether evidentiary items, including written confessions, should be taken to the jury room rests within the discretion of the trial judge, whose decision will not be disturbed unless there was an abuse of discretion to the prejudice of the defendant. (*People v. Caldwell* (1968), 39 Ill. 2d 346, 359; *People v. Williams* (1983), 97 Ill. 2d 252, 292; *People v. Allen* (1959), 17 Ill. 2d 55, 62.) In *Caldwell*, this court held:

> "[A] signed confession which has been shown by the State to be free from coercive conditions is among the strongest kinds of physical evidence the prosecution may produce, and when the tests of admissibility have been met and the defense afforded the full opportunity to point out any circumstances which may go to undermine the credibility of the confession in the eyes of the jury, there appears to us no valid reason to preclude the written confession from going to the jury room along with other exhibits which the trial judge may deem proper." (*Caldwell*, 39 Ill. 2d at 359.)

In this case, we find that it was proper to send the transcript of the confession, which was found to be voluntary, to the jury.

Defendant's final claim concerning the confession involves the State's rebuttal closing argument. During rebuttal, the prosecutor argued that defendant's correction in the transcript of his confession indicated that he was "thinking and controlling" on the day of the murder. Defendant contends that such argument was improper and resulted in substantial prejudice since the State used the argument to support its claim of sanity.

Under current law it is permissible for the State to present its theory of the case to the jury as long as that theory is based upon the evidence and reasonable inferences therefrom. (See *People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76; see *People v. Yates* (1983), 98 Ill. 2d 502, 532.) Prosecutorial argument not based on the evidence or reasonable inferences flowing from the evidence requires reversal if it results in substantial prejudice to the defendant. (*People v. Smith* (1990), 141 Ill. 2d 40, 60.) Here, it was reasonable for the prosecutor to infer that defendant was capable of thinking and in control of his intellect on the day of the murder because he had the presence of mind to "correct" his confession before he signed it. The jury was aware of the fact that defendant made a correction in the transcript of his confession, and was capable of drawing its own conclusion with respect to defendant's reasoning for changing the confession. Accordingly, we find that even if the prosecutor's argument was improper it did not result in substantial prejudice to defendant.

We therefore conclude that defendant was not denied a fair trial by the publication of the confession to the jury, or by the prosecutor's argument with respect to the confession.

## CLOSING ARGUMENTS

Defendant next argues that he was denied a fair trial

because the prosecutor made numerous improper and prejudicial remarks during closing argument.

It is well settled that a prosecutor is allowed a great deal of latitude in closing argument (*People v. Williams* (1991), 147 Ill. 2d 173, 231) and has the right to comment upon the evidence presented and upon reasonable inferences arising therefrom, even if such inferences are unfavorable to the defendant. (See *People v. Holman* (1984), 103 Ill. 2d 133, 163.) The prosecutor may also respond to comments by defense counsel which clearly invite a response. (*Williams*, 147 Ill. 2d at 232.) However, a prosecutor must refrain from making improper, prejudicial comments and arguments. Even if a prosecutor's closing remarks are improper, they do not constitute reversible error unless they result in substantial prejudice to the defendant such that absent those remarks the verdict would have been different. (*People v. Lucas* (1989), 132 Ill. 2d 399, 437; *People v. Morgan* (1986), 112 Ill. 2d 111, 132.) Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion. (See *People v. Smothers* (1973), 55 Ill. 2d 172, 176.) Thus, the trial court's determination regarding the propriety of a prosecutor's remarks will not be reversed unless there is a clear abuse of discretion. See *Smothers*, 55 Ill. 2d at 176.

In this case, the State posed the rhetorical question of whether defendant could have presented an alibi defense, a mistaken identification defense or raised a claim of self-defense. The State then implied that only an insanity defense was possible. Defendant further contends that the State gave an improper personal opinion regarding the insanity defense.

In the instant case, the evidence supported the prosecutor's argument that other defenses were unavailable to defendant. Defendant was unable to plead self-defense or

accident given the following facts: the victim was a senior citizen who was murdered for only $4 and a few household articles; defendant only received a small cut on his finger from his struggle with the victim; and the victim's body was mutilated and partially burned by defendant. An alibi defense or a claim that someone else committed the crime was implausible because defendant's clothes were covered with the victim's blood and the victim's belongings were found in defendant's apartment. We conclude, therefore, that the prosecutor's remarks were reasonable inferences supported by the evidence presented at trial.

Defendant next alleges that the prosecutor's arguments that insanity is "the defense of last resort" and that "lawyers don't like the insanity defense" also constitute unsubstantiated personal opinion. However, defendant has waived this issue for review by failing to raise the alleged error in his post-trial motions. (*Enoch*, 122 Ill. 2d at 186.) We decline to review this issue under the plain error doctrine because the evidence of defendant's guilt was overwhelming. Moreover, the State's comments cannot be considered so seriously prejudicial that they prevented defendant from receiving a fair and impartial trial.

Defendant next contends that the State suggested that defense counsel fabricated the insanity defense, as evidenced by the following statements during closing argument:

> "You know, this whole defense of insanity on these facts would be laughable if we weren't dealing with such a serious case, such an important case. This whole theory the defense has concocted to present to you here in court would be laughable. But it's not laughable."

This court has held that "[u]nless based on some evidence, statements made in closing arguments by the prosecution which suggest that defense counsel fabri-

cated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper." (*People v. Emerson* (1983), 97 Ill. 2d 487, 497.) Nonetheless, this statement must be considered in the context in which it was made. While the term "concoct" may connote a strategy fabricated for trial, it does not necessarily imply that the defense counsel played any role in its creation. Such comments relied on by defendant do not sufficiently refer to defense counsel or attribute any particular wrongdoing to him. In addition, the prosecutor did not challenge the motives or ethics of defense counsel. Examined in context, we find that the State's comment does not amount to an accusation that defense counsel fabricated a defense; rather, the State's remark was directed to the credibility of defendant.

Careful review of the record reveals that the State was accusing defendant of concocting an insanity defense in an attempt to avoid a murder conviction. The State's argument was based upon the cross-examination of Dr. Ziporyn as set forth below:

"PROSECUTOR: As early as August 23rd, he was known to be a manipulator in the County Jail, did you read that notation in the file?

DR. ZIPORYN: I saw that statement.

* * *

PROSECUTOR: Sir, I take you to October 30th of 1983, after he had been in jail for a couple of months, did you note the notation by the mental health professional that this Defendant told him that he was using the insanity defense to offset the State's request for the death penalty, did you see that in those preliminary records?

DR. ZIPORYN: I saw that.

* * *

PROSECUTOR: In that report, sir, did Dr. Grossman document that Renaldo Hudson told her that he is not a fool and that there is a lot of evidence for an insanity de-

fense and he didn't even have a psychiatric history, is that in the report?

DR. ZIPORYN: Yes."

Where supporting evidence exists, a prosecutor can argue that a defendant concocted a mental disease or defect to avoid responsibility for his crimes by relying on the insanity defense. (*People v. Gacy* (1984), 103 Ill. 2d 1, 83.) Moreover, challenging the credibility of a defendant and his theory of defense is proper in closing argument when there is evidence justifying the challenge. (*People v. Tiller* (1982), 94 Ill. 2d 303, 319.) In this case, sufficient evidence existed to support the State's comment that defendant concocted his insanity defense, and that such comments were not directed to the defense counsel's integrity.

Defendant next asserts that the prosecutor's rebuttal closing argument was prejudicial because it improperly attacked the credibility of Dr. Ziporyn. The prosecutor stated:

"You should be outraged by the simple expedience of him [defense counsel] dropping a few bucks on him [Dr. Ziporyn] that he [Dr. Ziporyn] will belly up to that witness stand a try [*sic*] to flim-flam you 12 people ***. And I think it was obvious what he was trying to do, a hired agent of this manipulator sitting in front of you today."

Defendant contends that this statement demeaned Dr. Ziporyn by suggesting to the jury that defense counsel suborned perjury by paying Dr. Ziporyn to diagnose defendant as insane. Additionally, defendant contends that the State engaged in improper personal attacks on Dr. Ziporyn when the prosecutor commented that he was "biased and slanted and a kook." Since defendant failed to object at trial and to raise this alleged error in his post-trial motions, we find the issue waived. *Enoch*, 122 Ill. 2d at 186-87.

Moreover, when examined in context, the comments did not amount to an accusation that defense counsel suborned perjury. Rather, the argument was a direct attack on the credibility of defendant's expert witness. It was established at trial that Dr. Ziporyn, a paid expert, testified in "hundreds and hundreds" of cases on behalf of defendants, and that he knew defendant had twice made comments about hiding behind the insanity defense. The credibility of a witness is a proper subject for closing argument if it is based on the evidence or inferences drawn from it. *Ramey*, 151 Ill. 2d at 534; *People v. Flores* (1989), 128 Ill. 2d 66, 94.

Aside from properly attacking the credibility of a witness, it appears that the prosecutor's remarks were invited by defense counsel's closing argument. Defense counsel informed the jury:

"Dr. Tuteur is here and I think it is clear the only reason he is here is to be paid. He is to be paid by the State."

Defense counsel's remarks invited the prosecutor's line of argument concerning the payment of experts for their evaluation and testimony. The State was merely responding to defense counsel's accusations regarding the State's expert. This court has held that when defense counsel provokes a response, the defendant cannot complain that the prosecutor's reply denied him a fair trial. *Ramey*, 151 Ill. 2d at 555.

Finally, defendant claims that the State improperly relied upon the credibility of the State's Attorney's office to convince the jury that defendant was sane at the time of the crime. However, review of the record reveals that the State's remark was made in response to comments made by defense counsel that suggested that the State introduced evidence on cross-examination solely to obtain a death sentence. Thus, the State responded to this charge in rebuttal by arguing that its purpose was

not to obtain the death penalty at all costs, but to present valid evidence. We find, therefore, that the State's argument was an invited reply to comments made by defense counsel (see *Williams*, 147 Ill. 2d at 232) and was not improper.

## JURY INSTRUCTIONS

Defendant's final challenge to the trial proceedings concerns the jury instructions. Defendant argues that the trial court improperly refused a defense-tendered non-Illinois Pattern Jury Instruction (non-IPI) which stated that the jury should not consider the number of witnesses called to testify on the affirmative defense of insanity. Defendant contends that without this instruction, the jury may have rejected his insanity defense because the State had more psychiatric expert witnesses than defendant.

It is well settled that an Illinois Pattern Jury Instruction (IPI) shall be used when applicable, unless the court determines that it does not accurately state the law. (134 Ill. 2d R. 451(a); *Ramey*, 151 Ill. 2d at 535.) The decision whether to give a non-IPI instruction is within the discretion of the trial court, and will not be reversed absent a showing of abuse of discretion. (*Thompkins*, 121 Ill. 2d at 441.) IPI Criminal 2d No. 3.18 ("Weighing Expert Testimony") contains only a committee note which states: "The Committee recommends that no instruction be given on this subject. *** The believability of expert testimony is a proper subject of closing argument." (Illinois Pattern Jury Instructions, Criminal, No. 3.18 (2d ed. 1981).) In the instant case, the jury was adequately instructed as to defendant's theory of the case, and the trial court found that the non-IPI instruction would not serve any purpose. Moreover, an instruction was given to the jurors that they are the sole judges of the believability of witnesses and of the weight to be given to the

testimony of witnesses. Accordingly, the trial court did not abuse its discretion by refusing defendant's non-IPI instruction.

## SENTENCING ISSUES

Following the guilty verdict, the court was informed that juror Loretta Buchanan could miss several days due to illness. The trial court concluded that, since the alternate sat through the entire case and the evidence was overwhelming, it would impanel the alternate juror. The sentencing jury found defendant eligible for the death penalty since defendant was found guilty of murder, he was 18 years old or older at the time of the murder, and the murder was committed in the course of another felony (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)), namely armed robbery.

Defendant first contends that his death sentence should be vacated since it was not imposed by the same jury that found him guilty. Given the presence of the alternate juror on the sentencing jury, defendant contests its authority to impose the death sentence.

Our statute sets forth the following requirements for conducting a death penalty hearing:

"Where requested by the State, the court shall conduct a separate sentencing proceeding to determine the existence of factors set forth in subsection (b) and to consider any aggravating or mitigating factors as indicated in subsection (c). The proceeding shall be conducted:

1. before the jury that determined the defendant's guilt; or

2. before a jury impanelled for the purpose of the proceeding if:

A. the defendant was convicted upon a plea of guilty; or

B. the defendant was convicted after a trial before the court sitting without a jury; or

C. the court for good cause shown discharges the jury that determined the defendant's guilt; or

3. before the court alone if the defendant waives a jury for the separate proceeding." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d).)

Defendant contends that the reference to "jury" in section 9—1(d)(1) of the statute excludes alternates, and that the alternate juror in this case was not part of the jury at the guilt/innocence phase of the trial. We find defendant's claim to be without merit.

We adopt the principle that a jury consists of all the jurors, including alternates. (See *State v. Claytor* (1991), 61 Ohio St. 3d 234, 238, 574 N.E.2d 472, 477.) Consequently, the alternate juror in this case was part of the jury. Furthermore, it has been held that the discharge of a juror is a matter within the trial court's discretion and prejudice must be shown to warrant reversal. (See *People v. Silagy* (1984), 101 Ill. 2d 147, 171; *Flath v. Madison Metal Services, Inc.* (1991), 212 Ill. App. 3d 367, 378.) In light of the fact that juror Buchanan was going to be absent for several days, the trial court did not abuse its discretion by discharging her and proceeding with the alternate since waiting for her return would have resulted in an unnecessary delay. There was no prejudice to defendant since the alternate had heard the evidence presented at both defendant's trial and at the capital sentencing hearing. Thus, the death sentence should not be vacated.

### Admissibility of Aggravating Factors

Defendant next claims that he was denied a fair sentencing hearing because the trial court allowed into evidence unreliable and irrelevant testimony concerning an attempted escape which purportedly included defendant.

During the second phase of the sentencing hearing, the prosecutor presented the testimony of Charles Mitch-

ell in aggravation. Mitchell, an investigator with the Cook County department of corrections, testified that inmate Alfred Clarkson told him that seven inmates were planning an escape from jail. Clarkson specifically identified defendant and the other inmates involved in the escape plan. Clarkson revealed the method of escape which involved shimmying up a shaft onto the roof of the jail through the use of a rope made out of bed sheets. Clarkson told Mitchell that the plan also included the killing of a guard and a sergeant by inmate Robert St. Pierre.

After receiving this information, department officials conducted a search of an air shaft leading to the roof of the jail. During this search, correctional officer Kenneth Jason found items that substantiated Clarkson's claims about the escape plan. Officer Jason, who conducted the search, testified that he found a rope, which was approximately 100 feet long and made out of intertwined sheets, hanging from the middle of the shaft. According to Mitchell, the search also resulted in the discovery of homemade knives found in the possession of St. Pierre. As a result of Clarkson's information and the search, the escape was prevented. An attempted escape charge was brought against defendant but was subsequently nolprossed.

Defendant's motion to strike any testimony concerning the attempted escape was denied. Defendant now contends that Mitchell's testimony, with respect to defendant's participation in an attempted escape plan, was (1) unreliable because it was uncorroborated hearsay; and (2) irrelevant since it referred to other inmates' participation in the escape, which had no relation to defendant.

Initially, we note that, when determining the admissibility of evidence during the aggravation/mitigation phase of the sentencing hearing, the only requirement is that the evidence be reliable and relevant. (*Young*, 128

Ill. 2d at 53; *People v. La Pointe* (1981), 88 Ill. 2d 482, 498-99.) The evaluation of the evidence's reliability and relevance lies within the sound discretion of the sentencing judge. *People v. Richardson* (1988), 123 Ill. 2d 322, 361-62.

Relevant and reliable evidence may be introduced during the second phase of the sentencing hearing even if it would be inadmissible, pursuant to the rules of evidence, during the guilt/innocence phase of the trial. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(e).) Evidentiary rules are waived at this stage because, in determining the appropriate sentence, the sentencing authority must possess the fullest information possible concerning the defendant's life, character, criminal record and the circumstances of the particular offense. (*People v. Patterson* (1992), 154 Ill. 2d 414, 476, quoting *People v. Brisbon* (1989), 129 Ill. 2d 200, 218-19.) This court has found that evidence containing hearsay is not *per se* inadmissible. (*Young*, 128 Ill. 2d at 54.) Hearsay evidence of other crimes which did not result in prosecution or conviction is therefore admissible at the second phase of a death penalty hearing if it meets the requirements of reliability and relevancy. *Young*, 128 Ill. 2d at 54.

After examining the record, we find that the trial court did not abuse its discretion by admitting Mitchell's testimony. That testimony was both reliable and relevant. Mitchell's testimony was reliable since the physical evidence found during the search corroborated Clarkson's claims concerning the plotting and method of escape. The rope found in the air shaft leading to the roof and the shanks found on St. Pierre provide further substantiation for the information Clarkson told Mitchell about the escape plan. Because the reliability of Clarkson's statements to Mitchell regarding the escape attempt was established, it is reasonable to conclude that Clarkson's implication of defendant in the attempted es-

cape was also reliable. Although the charge of attempted escape against defendant was nol-prossed, the evidence sufficiently supported Mitchell's testimony regarding defendant's involvement.

Mitchell's testimony was also relevant because it related to past criminal conduct by defendant. Such conduct provides an insight into defendant's character. Specifically, we find that Mitchell's testimony that Edgar Hope and Jackie Wilson were being held in jail for having murdered police officers and that St. Pierre was to kill a guard and a sergeant as part of the escape plan was relevant because defendant's association with such violent inmates reflects on his character and criminal propensity. Such evidence is relevant because the sentencing body has a duty to predict defendant's future behavior based on his past conduct. (*Henderson*, 142 Ill. 2d at 339, citing *Skipper v. South Carolina* (1986), 476 U.S. 1, 5, 90 L. Ed. 2d 1, 7, 106 S. Ct. 1669, 1671.) Consequently, Mitchell's testimony, although based on hearsay regarding an attempted escape charge that was nol-prossed, was properly admitted since it met the requirements of reliability and relevancy.

Defendant also contests the admissibility of testimony by Officer Robert Mantia, a Chicago police officer, concerning his prior arrests. Officer Mantia testified that he investigated three robberies and an aggravated assault, and that his investigation resulted in defendant's arrest. Defendant argues that Officer Mantia's testimony was unreliable because (1) he failed to describe any criminal conduct by defendant and (2) he did not identify any witnesses to the crimes.

A similar issue was raised in *People v. Morgan* (1986), 112 Ill. 2d 111. In *Morgan*, during the sentencing hearing, a police officer testified that, when he investigated a reported armed robbery and shooting several years earlier, he discovered that the defendant had shot

two individuals. The officer admitted that he did not witness the alleged shooting and that the charges resulting from the incident were dismissed. This court found that the trial judge, acting as the trier of fact at the death penalty hearing, did not abuse his discretion in admitting the testimony of the officer. This court held that "[a] sentencing body ' " 'may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information [it] may consider, or the source from which it may come' [citations]." ' " (*Morgan*, 112 Ill. 2d at 143, quoting *People v. Owens* (1984), 102 Ill. 2d 88, 111.) The court also held that the sentencing judge has discretion to determine whether evidence is relevant and reliable, and that evidence of other criminal conduct has generally been regarded as relevant to the question of the defendant's character. (*Morgan*, 112 Ill. 2d at 143.) Moreover, this court has recognized that hearsay evidence at the sentencing hearing is not *per se* unreliable. (*Morgan*, 112 Ill. 2d at 143.) Based upon the foregoing principles, the court found that the testimony of the officer was relevant to sentencing and reliable since the officer compiled the information during an official investigation. *Morgan*, 112 Ill. 2d at 144.

We likewise conclude that, in the present case, the trial court did not abuse its discretion in admitting the testimony of Officer Mantia with respect to defendant's prior arrests. This court has repeatedly held that evidence involving previous misconduct by the defendant which did not result in prosecution or conviction may be admissible if relevant and reliable. (*Richardson*, 123 Ill. 2d at 361; *Morgan*, 112 Ill. 2d at 143-44.) Here, the evidence of other criminal misconduct was properly admitted since it was both relevant and reliable. This evidence was relevant to the sentencing phase since it related to defendant's criminal history and provided some insight into defendant's character. (See *Richardson*, 123 Ill. 2d

at 362.) This evidence was also reliable given the fact that Officer Mantia's testimony was based on his own investigation and arrest of defendant. (See *Morgan*, 112 Ill. 2d at 144.) Therefore, we conclude that the aggravating evidence which the State introduced was properly admitted and did not deprive defendant of a fair sentencing hearing.

### Consideration of Mitigating Factors

Defendant next argues that his death sentence should be vacated because the prosecutor improperly discounted the mitigating evidence introduced by the defense. Defendant asserts that the prosecutor's remarks violated the eighth and fourteenth amendments by preventing the sentencing jury from giving adequate consideration to the mitigating evidence concerning defendant's turbulent family life and abused childhood.

In closing argument at the conclusion of the second stage of the sentencing hearing, the prosecutor made the following comments:

> "Don't let him put his guilt on you, shift that burden to you because he may have had a brother die at a young age or because his parents separated, because he cannot shift the guilt to you for something that happened in his life. That is not mitigation either. All he is trying to do with that type of evidence is divert your attention away from the issue here, and the issue here, ladies and gentlemen, is the magnitude of this crime. The issue here is what he did and what the appropriate sentence should be.
>
> * * *
>
> Don't let [the defendant] shift the burden of his guilt to you and put some kind of a guilt trip on you, and don't let him shift it to his father and try to blame it on his father, because you are simply here to administer justice, to weigh the evidence you heard these last couple of days and follow the law the judge gives you."

Defendant first contends that the effect of the prosecutor's remarks was to mislead the jury into believing that it could not consider defendant's turbulent family life and abused childhood as mitigating factors. We do not agree.

In order to meet constitutional standards, a capital sentencing hearing must allow for individualized consideration of the offender and the offense. (*Woodson v. North Carolina* (1976), 428 U.S. 280, 303-05, 49 L. Ed. 2d 944, 960-61, 96 S. Ct. 2978, 2991.) In conjunction with that requirement, the Supreme Court has held that the sentencer in a capital case may not be precluded from considering, or refuse to consider as a matter of law, any relevant mitigating evidence offered by the defense. (*Hitchcock v. Dugger* (1987), 481 U.S. 393, 95 L. Ed. 2d 347, 107 S. Ct. 1821; *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869; *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954.) By allowing the sentencer to consider all relevant mitigating evidence, the requirement of individualized sentencing in capital cases is satisfied. (*People v. Page* (1993), 155 Ill. 2d 232, 279, quoting *Blystone v. Pennsylvania* (1990), 494 U.S. 299, 307, 108 L. Ed. 2d 255, 264, 110 S. Ct. 1078, 1083.) It has been previously held that evidence of a turbulent family history (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869) and of an abused childhood (*Penry v. Lynaugh* (1989), 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934) are both relevant mitigating factors.

Despite these requirements, this court has held that a prosecutor is not required to agree with the defendant that the evidence offered in his behalf is sufficiently mitigating to preclude imposition of the death penalty, or that it is even mitigating at all. (*Page*, 155 Ill. 2d at 279.) During the sentencing hearing, the prosecutor may

contest the significance or weight of the defendant's evidence. *Page*, 155 Ill. 2d at 279; see *People v. Bean* (1990), 137 Ill. 2d 65, 124-27.

Here, the prosecutor simply discounted the significance of defendant's evidence in mitigation. The prosecutor's argument did not prevent or restrict defendant's presentation of mitigating evidence or the jury's consideration of such evidence. The prosecutor also did not inform the jury that the law prohibited it from considering this evidence in mitigation. Instead, the prosecutor merely argued that defendant's mitigating factors were insufficient to preclude the imposition of the death penalty. In his argument, the prosecutor pointed out that defendant's brothers experienced the same turbulent environment and yet did not commit crimes such as those committed by defendant. Consequently, the prosecutor urged the jury to consider defendant's turbulent childhood as a factor in aggravation instead of in mitigation. We find that it is permissible for a prosecutor to disagree with a defendant's assessment of the nature and character of the evidence in mitigation. Moreover, this court has held that it is not improper for a sentencer to consider a defendant's evidence of mitigation as a factor in aggravation. (See *Henderson*, 142 Ill. 2d at 339-41.) For these reasons, we conclude that the prosecutor's challenge to the sufficiency of defendant's mitigating evidence was proper since the jury was not precluded from considering the evidence of his childhood in mitigation.

Defendant also contends that the prosecutor's comments regarding defendant's shifting of guilt to the jury deprived him of a fair sentencing hearing. In addition to the comments discussed above, defendant relies on the prosecutor's remarks during rebuttal at the aggravation/mitigation phase of the sentencing hearing. During rebuttal, the prosecutor commented as follows:

"The defense is telling you don't kill Renaldo Hudson. They want you to feel guilty for the decision you have to make. You are not killing anyone. It's the Defendant that committed the conduct, which under the laws of [the] State of Illinois, our law stays [*sic*] that he should be sentenced to death."

Defendant asserts that the prosecutor's comments regarding defendant's shifting of guilt to the jury improperly diverted the jury's attention from a consideration of relevant mitigating factors. This allegation is without merit.

The prosecutor's remarks were invited by defense counsel. This court has held that when defense counsel provokes a response, the defendant cannot complain that the prosecutor's reply denied him a fair trial. (*Ramey*, 151 Ill. 2d at 555.) In the instant case, defense counsel, during closing argument at the sentencing hearing, made repeated emotional pleas not to kill defendant. Defense counsel attempted to create a sense of guilt in the jurors so as to impede their consideration of the death sentence. In response to this argument, the prosecutor simply called the jury's attention to defense counsel's strategy. The prosecutor pointed out to the jurors that they should not feel guilty for imposing the death sentence if it was warranted. Under these circumstances, we find that the prosecutor did not divert the jury's attention from the relevant mitigating factors.

### Future Crimes and Improper Characterization

Defendant next charges that he was denied a fair sentencing hearing because the prosecutor improperly suggested to the sentencing jury that, if the death penalty was not imposed, defendant would kill again. The prosecutor made the following comment during his closing at the aggravation/mitigation phase of the death penalty hearing:

"Think about what value you put on this life when [the defendant] spread those telephone pages on [the victim's] body and lit him on fire. Think about him and his contact when you weigh the evidence in this case to determine whether there is anything at all mitigating about [the defendant's] life. The conclusion you will draw, folks, is that this conduct, this murder was the work of the devil and nothing more, nothing more and nothing less, and think about the fact, ladies and gentlemen, that given the chance, [the defendant] will do it again. He will kill again if he is given the chance."

This court has held that a prosecutor may not speculate before a sentencing jury, in the absence of supporting evidence, that a defendant may commit future crimes if he is not sentenced to death. (See *Patterson*, 154 Ill. 2d at 481-82; *People v. Johnson* (1991), 146 Ill. 2d 109, 148; *Holman*, 103 Ill. 2d at 163, 165.) However, in the instant case, it is apparent that the prosecutor's remark was based upon the evidence of prior misconduct. Evidence was introduced at the sentencing hearing that homemade knives were found in defendant's cell. The record also reveals that defendant was part of an attempted escape plan, which included the killing of a guard. We conclude that the prosecutor's statement herein was supported by the evidence and was therefore proper.

Defendant also insists that he was deprived of a fair sentencing hearing by the prosecution's characterization of defendant as "the devil." This court has found it improper to characterize a defendant as an "animal" or "evil"; however, such a characterization will not result in reversible error unless it substantially prejudiced the defendant. (*People v. Johnson* (1992), 149 Ill. 2d 118, 156 (court declined to reverse because of the prosecutor's reference to the defendant as an "animal," "evil," and "creature" since the defendant did not show substantial prejudice); *People v. Coleman* (1989), 129 Ill. 2d 321, 347

(reference to defendant as "an animal" was improper, but there was insufficient prejudice to vacate the death sentence); *People v. Spreitzer* (1988), 123 Ill. 2d 1, 39 (prosecutor's remarks that defendant "should not be considered human" and that to call defendant "an animal \*\*\* would be an insult to the animals" were improper, but not sufficiently prejudicial to warrant vacating the death sentence).) In light of the overwhelming evidence introduced at the trial and sentencing hearing, we do not find that the prosecutor's reference to "the devil" substantially prejudiced defendant.

### Possible Penalties

Defendant next asserts that he was denied a fair sentencing hearing when the prosecutor improperly argued to the sentencing jury that, if the death penalty was not imposed, defendant could receive a sentence of 20 years in prison. During rebuttal, the prosecutor made the following remarks:

> "Twenty years. That [is] the low end of the sentencing alternative that Mr. Byrne did not tell you. If you don't impose the sentence of death, 20 years. That is the minimum sentence he can get, and he can get anywhere between 20 on the low end, all the way up to natural life, without parole. He can also get 20 years."

Defendant contends that the comment improperly suggested to the jury that defendant might later be released on parole if he was not sentenced to death. Defendant notes that this court has previously condemned prosecutorial arguments suggesting that a sentence of death is warranted because of the possibility of a defendant's later parole. *People v. Walker* (1982), 91 Ill. 2d 502, 515; *People v. Szabo* (1983), 94 Ill. 2d 327, 365-67.

We agree with the State, however, that the prosecutor's comment was invited by defense counsel's closing argument. Defense counsel told the jurors that, if they

did not sentence defendant to death, the judge could sentence defendant to natural life in prison without parole. This remark suggested to the jurors that defendant, if not sentenced to death, automatically would be sentenced to life imprisonment. The prosecutor responded to this remark by pointing out that natural life imprisonment was not the only alternative to a sentence of death. The judge also had the discretion to sentence defendant to 20 years' imprisonment, which includes the possibility of parole. (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—8—1(a)(1), 1003—3—3.) The prosecutor's reference to parole, which was made in response to defendant's argument, did not prejudice defendant. (See *People v. Howard* (1991), 147 Ill. 2d 103, 167.) Accordingly, we conclude that defendant was not denied a fair sentencing hearing.

## Jury's Responsibility

Defendant next alleges that the prosecutor's closing arguments to the sentencing jury improperly diminished the jury's sense of responsibility for imposing the death penalty in violation of the United States Supreme Court's holding in *Caldwell v. Mississippi* (1985), 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (the prosecution's argument that the jury's decision to impose death was not final and was automatically reviewable by the State supreme court violated the eighth amendment because it led the jury to believe that the responsibility for determining the appropriateness of the defendant's death rested elsewhere).

The State points out that defendant failed to object to the complained-of comments at the sentencing hearing; as such, the issue is waived on review. (*Enoch*, 122 Ill. 2d at 186-87.) This waiver rule applies during both the trial and sentencing hearing. However, because this issue involves the fairness of a capital sentencing hearing, we

will review the propriety of the prosecutor's statements. *Johnson*, 146 Ill. 2d at 147; see *Fields*, 135 Ill. 2d at 56.

Defendant's first claim of error regarding the alleged "shifting of responsibility" pertains to the prosecutor's remarks during closing and rebuttal argument. The prosecutor argued that the "decisions have been made by the lawmakers" and that the "law makes the decision for you based upon this evidence." Defendant argues that the State's comments led the jury to believe that the responsibility for imposing the death penalty rested with the lawmakers and the law. We disagree. Where the prosecutor's argument focuses on the jury's duty to follow and enforce the law, such an argument is proper. Here, the prosecutor noted that the lawmakers enacted laws, and that if the jurors did not find sufficient mitigation to preclude death it was their responsibility to follow the law and sentence defendant to death. These comments did not tend to diminish the jury's sense of responsibility for imposing the death penalty.

Defendant next asserts that the State placed the responsibility for imposing the death penalty upon defendant himself. Defendant relies on the following comments made by the prosecutor in rebuttal:

> "[Y]our decision was made for you by the Defendant, by the choices he made in committing the crime.
>
> * * *
>
> The defense is telling you don't kill Renaldo Hudson. They want you to feel guilty for the decision you have to make. You are not killing anyone. It's the Defendant that committed the conduct, which under the laws of [the] State of Illinois, our law stays [*sic*] that he should be sentenced to death."

These comments were in response to comments made by the defense counsel during closing argument. Defense counsel's argument contained repeated emotional pleas imploring the jury not to kill defendant. When the prose-

cutor's comments are read in context, it is clear that he was informing the jurors that they should not feel guilty for imposing death. This court has previously held that the prosecutor's argument to the jury not to feel guilty for enforcing the law was proper. (*Mahaffey*, 128 Ill. 2d at 429.) Moreover, there is no prejudice where comments are invited by defendant's argument. (See *Ramey*, 151 Ill. 2d at 556.) In this case, the jury was not misled regarding its responsibility for the sentencing decision.

Defendant's final claim of error regarding the alleged "shifting of responsibility" concerns the prosecutor's remarks during rebuttal:

> "The only way to give this law the special dignity to which it is entitled is to allow the law to impose the ultimate penalty which in fact our society has done. We are impowered [*sic*] to impose the ultimate penalty for the ultimate crime."

Defendant contends that the prosecutor's reference to "we" indicated that the prosecutor shared the responsibility for imposing the death sentence with the jury. Defendant relies on this court's decision in *People v. Yates* (1983), 98 Ill. 2d 502. In *Yates*, this court vacated the death penalty because the prosecutor told the jury that he personally would assume responsibility for imposing the death sentence. (*Yates*, 98 Ill. 2d at 536-38.) In the case at hand, the prosecutor never made such an argument. The prosecutor's reference to "we" was made in the context of "our society."

Viewing the prosecutor's argument in the context of the entire sentencing proceeding, we conclude that the challenged remarks did not mislead the jury or reduce its sense of responsibility in determining whether the death penalty was appropriate. The prosecutor repeatedly pointed out to the jurors that it was their responsibility and decision whether or not to sentence defendant to death. In addition, the jury was twice instructed by

the trial court that it was responsible for imposing the death sentence. Both the jury instructions and the verdict forms informed the jurors that defendant would be sentenced to death if the jurors unanimously found that there were no mitigating factors sufficient to preclude the death penalty. We find that the jury was fully aware of its role in imposing the death penalty. Consequently, we conclude that the prosecutor's comments did not result in a *Caldwell* violation.

### Constitutionality of the Illinois Death Penalty

Defendant finally challenges the constitutionality of the Illinois death penalty statute. Defendant first contends that the Illinois death penalty statute violates the eighth and fourteenth amendments of the United States Constitution by placing the burden of proof on the defendant, thereby precluding meaningful consideration of mitigating factors.

The death penalty statute states, in pertinent part, as follows:

> "If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(g).)

This court has held that this provision does not impose a constitutionally impermissible burden upon a defendant. (*Page*, 155 Ill. 2d at 283-84; *People v. Thomas* (1990), 137 Ill. 2d 500, 537-38.) We reaffirm those decisions.

Defendant further contends that the Illinois death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. This argument has been repeatedly considered and rejected by this court. (*Patterson*, 154 Ill. 2d at 488; *Johnson*, 146 Ill. 2d at 154.) We decline to reconsider this court's prior holdings. Therefore, we find that defendant's challenges to the

constitutionality of the Illinois death penalty statute lack merit.

## CONCLUSION

For the reasons set forth above, we affirm defendant's convictions and death sentence. We direct the clerk of this court to enter an order setting Tuesday, March 15, 1994, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of this mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

CHIEF JUSTICE MILLER, concurring:

I concur in the judgment of the court, and I join most of the majority opinion. I do not entirely agree, however, with the majority's discussion of the prosecutor's closing argument at the sentencing hearing, and for that reason I write separately.

In closing argument at the second phase of the sentencing hearing, the prosecutor urged the jurors to "think about the fact, ladies and gentlemen, that given the chance, [the defendant] will do it again. He will kill again if he is given the chance." The majority concludes that these comments were proper because they were supported by the evidence in this case. (157 Ill. 2d at 457.) I do not agree.

This court has previously expressed its disapproval of remarks, unsupported by any evidence, that a capital defendant might commit another murder if he is not sentenced to death. (*People v. Hooper* (1989), 133 Ill. 2d 469, 500-01; *People v. Gacho* (1988), 122 Ill. 2d 221, 256-

60; *People v. Holman* (1984), 103 Ill. 2d 133, 161-65.) The potential prejudice from comments of this nature can be especially great. The sentencing determination in a capital case requires, as a constitutional matter, an individualized consideration of the offense and the offender. (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75; *Woodson v. North Carolina* (1976), 428 U.S. 280, 304-05, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (plurality opinion).) Mere speculation regarding a defendant's future dangerousness, however, threatens to divert the jury's attention from that important task. *People v. Hayes* (1990), 139 Ill. 2d 89, 156-57; *People v. Szabo* (1983), 94 Ill. 2d 327, 366-67.

The State argues, and the majority agrees, that the prosecutor's comments in this case were supported by evidence of the defendant's involvement in a plan to escape from jail. As part of the State's evidence in aggravation, an investigator with the Cook County department of corrections testified to information he had received from an inmate of the Cook County jail. According to the investigator, this inmate had implicated the defendant and six other inmates in a plan to escape from the jail. As part of the plan, one of the inmates, Robert St. Pierre, was to kill a guard and a sergeant at the jail. Evidence was found corroborating the inmate's account of the escape plan, including the discovery, in an air shaft, of a 100-foot long rope fashioned from bed sheets. Also, two shanks were found in St. Pierre's jail cell.

Although I agree with the majority's determination that this evidence was properly admitted, I do not believe that the testimony substantiated the prosecutor's later argument that the defendant "will kill again if he is given the chance." The aggravating evidence implicated only St. Pierre, and not the defendant, in the scheme to

kill the jailers. Although the defendant could have been responsible for offenses committed by other escapees on an accountability theory, there was no evidence directly linking the defendant to the plan to kill the jailers, or even showing that the defendant had advance knowledge of inmate St. Pierre's intended role.

In further support of its conclusion that the prosecutor's comments were proper, the majority notes that on two occasions shanks had been found in the defendant's jail cell. Again, I do not consider this testimony sufficient to support the prosecutor's prediction that the defendant would commit another murder if not sentenced to death. Cases in which this court has declined to find error in prosecutorial comments on a defendant's future dangerousness involved substantially more evidence of the likelihood of misconduct by the defendant than was presented here. (See, *e.g., People v. Johnson* (1991), 146 Ill. 2d 109, 148-49 (defendant's statements to psychiatrist expressing intent to commit further murders if set free); *People v. Gacy* (1984), 103 Ill. 2d 1, 97 (defendant convicted of 33 murders).) The record in the case at bar does not contain evidence of a similar nature.

Although this portion of the prosecutor's closing argument was improper, I do not believe that the defendant is entitled to a new sentencing hearing. Defense counsel made no objection to the prosecutor's comments, and therefore the matter may be noticed on review only if it rises to the level of plain error. (See 134 Ill. 2d R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed [on review] although they were not brought to the attention of the trial court"); see also *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 401-02.) The remarks in this case clearly do not constitute plain error. The challenged comments were brief and unrepeated, the State presented substantial evidence in aggravation, and the defendant introduced only slight evi-

dence in mitigation. Accordingly, I would conclude that the plain error exception is not applicable here. I concur in the judgment of the court affirming the defendant's convictions and death sentence.

JUSTICES FREEMAN and McMORROW join in this concurrence.